**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | |
|---|---|
| SEYMOR MEYER, Individually and On Behalf of All Others Similarly Situated, | ) |
| | ) |
| Plaintiff, | ) **CIVIL ACTION NO. 04-CV-07897** |
| | ) **MBM** |
| | ) "ECF Case" |
| vs. | ) |
| | ) |
| CONVERIUM HOLDING AG, DIRK LOHMANN, and MARTIN KAUER, | ) CLASS ACTION COMPLAINT |
| | ) |
| | ) |
| Defendants. | ) **JURY TRIAL DEMANDED** |

_____

Plaintiff, Seymor Meyer ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Converium Holding AG ("Converium" or the "Company") securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the securities of Converium between December 11, 2001 and July 20, 2004, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Pursuant to 28 U.S.C. §1391(d), as an alien corporation, Covernium may properly be sued in any District in the United States, including the Southern District of New York.  Moreover, Covernium trades American Depository Receipts/Shares ("ADRs" or "ADS") on the New York Stock Exchange ("NYSE"), which is located in the Southern District of New York.  Thus, venue is proper in this Judicial District.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, Seymor Meyer, as set forth in the accompanying certification, incorporated by reference herein, purchased Converium securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant Converium is a Swiss Corporation with its principal executive offices located at Baarerstrasse 8, CH-6300 Zug Switzerland.

8.      Defendant Dirk Lohmann ("Lohmann") was, at all relevant times, the Company's Chief Executive Officer.

9.      Defendant Martin Kauer ("Kauer") was, at all relevant times, the Company's Group Chief Financial Officer.

10.     Defendants Kauer and Lohmann are collectively referred to hereinafter as the "Individual Defendants."  During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of Converium were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

11.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational

trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

12.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of Converium, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

13.     As officers and controlling persons of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets,

management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Converium, each of the Individual Defendants had access to the adverse undisclosed information about Converium financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Converium and its business issued or adopted by the Company materially false and misleading.

15.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

16.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Converium securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Converium business, operations, management and the intrinsic value of Converium securities; and (ii) caused Plaintiff and other members of the Class to purchase Converium securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Converium between December 11, 2001 and July 20, 2004, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

18.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Converium's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Converium or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

20.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)  whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Converium; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Converium is a global professional reinsurer that offers a range of traditional non-life and life reinsurance products, as well as non-traditional solutions to help clients manage capital and risk.  Its business is organized around three segments: standard property and casualty reinsurance, which include general third-party liability, motor, personal accident (assumed from non-life insurers) and property; specialty lines, which include agribusiness, aviation and space, credit and surety, engineering, marine and energy, professional liability and other special liability and workers' compensation, and life and health reinsurance, which contains life and disability, as well as accident and health lines of businesses.

24.     Converium was the new holding company for the third-party assumed reinsurance operations of Zurich Financial Services ("ZFS").  On Oct. 1, 2001, Converium entered into a series of transactions that had the effect of formally separating Converium from ZFS.  At the same time, ZFS injected further capital into Converium, generating opening shareholders' funds in Converium as at Oct. 1, 2001 of at least $1.6 billion.  During the fourth quarter of 2001, ZFS had, by way of an IPO, sold at least 70% of its entire shareholding of Converium.  ZFS' management had elected for a demerger and IPO as the exit route for ZFS from assumed reinsurance following consideration of a number of alternatives.

### Materially False And Misleading
### Statements Issued During The Class Period

25.     The Class Period commences on December 11, 2001.  At that time, Converium's Prospectus (the "Prospectus") with respect to the IPO.  The offering was priced at CHF 82 per share or US$ 24.59 per ADS and corresponded to 119.2% of book value as of October 1,  2001. Each ADS

represents half of one share.  The Global Offering comprised a public offer of 35.0 million shares (excluding the over-allotment option of up to 5.0 million shares) by ZFS in the form of shares in Switzerland and shares or ADSs in the US, and to institutional investors elsewhere  In addition, ZFS had granted the Underwriters an over-allotment option of up to 5.0 million shares.   If the over-allotment option was exercised in full ZFS would no longer hold any shares in Converium.

     26.    In the December 11, 2001 Prospectus, Converium stated:

> Our loss reserves may not adequately cover future losses and benefits
>
> Our loss reserves may prove to be inadequate to cover our actual losses and benefits experience. To the extent loss reserves are insufficient to cover actual losses, loss adjustment expenses or future policy benefits, we would have to add to these loss reserves and incur a charge to our earnings which could have a material adverse effect on our financial condition, results of operations and cash flows.
> Loss reserves do not represent an exact calculation of liability, but rather are estimates of the expected cost of the ultimate settlement of losses. All of our loss reserve estimates are based on actuarial and statistical projections, at a given time, of facts and circumstances known at that time and estimates of trends in loss severity and other variable factors, including new concepts of liability and general economic conditions. Changes in these trends or other variable factors could result in claims in excess of our loss reserves,
>
> Unforeseen losses, the type or magnitude of which we cannot predict, may emerge in the future.
>
> These additional losses could arise from newly acquired lines of business, changes in the legal environment, extraordinary events affecting our clients such as reorganizations and liquidations or changes in general economic conditions.
>
> In addition, because we, like other reinsurers, do not separately evaluate each of the individual risks assumed under reinsurance treaties, we are largely dependent on the original underwriting decisions made by ceding companies. We are subject to the risk that our ceding companies may not have adequately evaluated the risks to be reinsured and that the premiums ceded to us may not adequately compensate us for the risks we assume.

We had $4,546 million of gross reserves and $3,333.8 million of net reserves for losses and loss adjustment expenses as of December 31, 2000. If we underestimated these net reserves by 5%, this would have resulted in $166.7 million of incurred loss and loss adjustment expenses, before income taxes, for the year ended December 31, 2000.

27.   With respect to the establishment of loss and loss adjustment expense reserves, the

Company stated:

We are required by applicable insurance laws and regulations and U.S. GAAP to establish reserves for payment of losses and loss adjustment expenses that arise from our products. These reserves are balance sheet liabilities representing estimates of future amounts required to pay claims and claim adjustment expenses for insured claims which have occurred at or before the balance sheet date, whether already known to us or not yet reported. Significant periods of time can elapse between the occurrence of an insured claim, its reporting by the insured to the primary insurance company and from the insurance company to its reinsurance company. Loss reserves fall into two categories: reserves for reported losses and loss adjustment expenses and reserves for incurred but not reported, or IBNR, losses and loss adjustment expenses.

Upon receipt of a notice of claim from a ceding company, we establish a case reserve for the estimated amount of the ultimate settlement. Case reserves are usually based upon the amount of reserves reported by the primary insurance company and may subsequently be supplemented or reduced as deemed necessary by our claims department. We also establish reserves for loss amounts that have been incurred but not yet reported, including expected development of reported claims. These IBNR reserves include estimated legal and other toss adjustment expenses. We calculate IBNR reserves by using generally accepted actuarial techniques. We utilize actuarial tools that rely on historical and pricing information and statistical models as well as our pricing analyses. We revise these reserves for losses and loss adjusted expenses as additional information becomes available and as claims are reported and paid. Our estimates of reserves from reported and unreported losses and related reinsurance recoverable assets are reviewed and updated. Adjustments resulting from this process are reflected in current income. The analysis relies upon the basic assumption that past experience, adjusted for the effect of current developments and likely

trends, is an appropriate basis to estimate our current loss and loss adjustment expense liabilities. Because estimation of loss reserves is an inherently uncertain process. quantitative techniques frequently have to be supplemented by professional and managerial judgement. In addition, trends that have affected development of reserves in the past may not necessarily occur or affect reserve development to the same degree in the future.

The uncertainty inherent in loss estimation is particularly pronounced for long-tail lines such as umbrella, general and professional liability and motor liability, where information, such as required medical treatment and costs for bodily injury claims. will only emerge over time. In the overall reserve setting process, provisions for economic inflation and changes in the social and legal environment are considered. The uncertainty inherent in the reserving process for primary insurance companies is even greater for the reinsurer. This is because of, but not limited to, the time lag inherent in reporting information from the insurer to the reinsurer and differing reserving practices among ceding companies. As a result, actual losses and loss adjustment expenses may deviate, perhaps materially, from expected ultimate costs reflected in our current reserves.

In setting reserves, we utilize the same integrated, multi-disciplinary approach we use to establish our reinsurance prices. After an initial analysis by members of our actuarial staff, preliminary results are shared with appropriate underwriters, pricing actuaries, claims and finance professionals and, as appropriate, senior management. Final actuarial recommendations incorporate feedback from these professionals.

We have developed a proprietary global loss reserve estimation system, which we refer to as FRAME. It applies a number of standard actuarial reserving methods on a contract by contract basis. This allows us to calculate estimates of IBNR for each transaction based on its own characteristics. Specifically, for each contract, we initially utilize the expected toss-ratio we estimated during the initial underwriting and pricing process, and apply the specific paid and incurred loss emergence patterns for that transaction. In some cases, the initial expected loss ratio is revised over time. For smaller transactions we apply emergence patterns which we believe are characteristic for this type of business. Where applicable, we apply the specific terms of the contract, such as per-loss event limits and aggregate loss limits per period, within the calculations. In the case of contracts that have significant structural elements, such as

aggregate deductible or loss corridor provisions, we utilize a probabilistic estimation approach.

In addition to these bottom-up approaches we utilize standard top down analyses. For these methods we aggregate the majority of our business into a number of homogeneous classes and apply standard actuarial reserving techniques. This provides an alternative view that is less dependent on pricing information.

The various methods described above allow us to produce a range of reserve estimates. We review these estimates and establish our reserves at a reasonable level within the range.

In accordance with U.S. GAAP, we do not establish contingency reserves for future catastrophic losses in advance of the event's occurrence. As a result, a catastrophe event may cause material volatility in our incurred losses and reserves and a material impact on our reported income, subject to the effects of our retrocessional reinsurance."

28.     With respect to the adequacy of the reserves, the Company stated:

Given the inherent uncertainty of the loss estimation process described above, we employ a number of methods to develop a range of estimates. On the basis of our actuarial reviews we believe our liability for gross losses and loss adjustment expenses, referred to as gross reserves, and our gross reserves less reinsurance recoverables for losses and loss adjustment expenses ceded, referred to as net reserves, at the end of all periods presented in our historical combined financial statements were determined in accordance with our established policies and were reasonable estimates based on the information known at the time our estimates were made. These analyses were based on, among other things, original pricing analyses as well as our experience with similar lines of business and historical trends, such as reserving patterns, exposure growth, loss payments, pending levels of unpaid claims and product mix, as well as court decisions and economic conditions. However, since the establishment of loss reserves is an inherently uncertain process, the ultimate cost of settling claims may exceed our existing loss and loss adjustment expense reserves, perhaps materially. Any adjustments which result from changes in reserve estimates were reflected in our results of operations.

Since reserving is an inherently uncertain process, we retained, in the second quarter of 2001, the actuarial consulting firm Tillinghast-Towers Perrin, or Tillinghast; to perform an independent review of our non-life net reserves as of December 31, 2000. In their analysis, Tillinghast relied on data available at the time we issued our December 31, 2000 financial statements, and also on certain information that became available subsequently. Tillinghast has relied on us as to the accuracy and completeness of this data and information. Based on the Tillinghast analysis, which reflected certain information that became available after the issuance of our December 31, 2000 financial statements and based on our own evaluations of these new developments, we determined to record in the first half of 2001 additional provisions of $112 million, net of reinsurance, principally related to accident years 2000 and prior at Converium North America. Tillinghast has confirmed to us that our net reserves as of December 31, 2000 plus the first half of 2001 reserve strengthening correspond to Tiliinghast's best estimate of our liabilities for net loss and loss adjustment expenses as of December 31, 2000 for Converium on a historical combined basis. Tillinghast has not conducted another review with respect to our reserves at June 30, 2001 or any other subsequent period.

The 5112 million reserve strengthening discussed above was determined in accordance with our loss reserving policies as described in "- Establishment of Loss and Loss Adjustment Expense Reserves", and was recorded in accordance with our established accounting policies as described in Note 2(e) of our historical combined financial statements. Under these policies we review and update our reserves as experience develops and new information becomes known, and we bring our reserves to a reasonable level within a range of reserve estimates by recording an adjustment in the period when the new information confirms the need for an adjustment. The Tillinghast review was begun during the second quarter of 2001 and completed in the third quarter. Tillinghast actuaries had conducted similar reviews for other insurers and reinsurers and were able to refer to their proprietary loss development data. Tillinghast also used several top-down approaches including their broad database of insurance and reinsurance loss trends. Tillinghast actuaries and our Converium actuaries were also able to access information that was not known in the first quarter of 2001 when we completed our year-end 2000 financial reporting to Zurich Financial Services. This information included most fourth quarter 2000 and some first quarter 2001 reports from our ceding companies who typically report on a one-quarter lag. Analyses of these reports

-14-

in relation to earlier periods' reports, disclosed adverse loss development across several lines of business, mainly relating to general liability, commercial auto liability and umbrella policy business written in 1996 through 1999. We reviewed and evaluated this new information as we completed our first half 2001 financial reporting. Our revised estimate of reserves, based mainly on the new ceding company reported data, was in line with Tillinghast's principally top-down reserve estimate within its range of estimates. Accordingly, we recorded an adjustment to loss and loss adjustment reserves at that time.

Terry G. Clarke has been elected to our Board of Directors, with his election to take effect on January 2, 2002. Mr. Clarke is currently a consulting actuary with Tillinghast and managing principal of Towers Perrin. He will be retiring from Tillinghast on December 31, 2001. Mr. Clarke did not participate in Tillinghast's actuarial review of Converium.

29.     On March 18, 2002, Converium reported on its successful 2002 renewal and its results for 2001. The Company renewed 73% of its premium volume that was renewable at January 1, 2002 and experienced combined increases in rates and shares of around 25%. The non-renewed premium volume was mostly offset by new business. The aggregate impact of improved rates, increased shares and new business, offset by cancellations, resulted in premium growth of 19% on renewable premiums. With respect to its financial highlights, the Company stated:

Strong balance sheet to harvest in a hardening market

- Strong capitalization (equity: US$1.6 billion)
- September 11: net loss capped at US$289.2m
- Asbestos & Environmental: marginal exposure (less than 1% of loss reserves, gross), reserve-levels substantially strengthened to a survival ratio of 13.8 years (2000: 13.1 years)
- **Solid reserve-levels maintained**
- Enron-exposure: full limits booked as incurred loss (Surety: US$56.0m; E&O: US$8.5m; D&O: US$2.4m; Credit: US$0.5m)
- Low exposure to D&O policies

30.     With respect to Convernim North America, the Company stated:

Converium North America is the business segment responsible for all property liability as well as accident and health reinsurance business written in the United States and Canada. It is also the Group's global Center of Excellence for agribusiness. We are one of the largest broker-market reinsurers in the US, leading all lines of business on a broker basis for treaty reinsurance, and on a direct basis for individual risks.

36% of Converium Group's business was underwritten by the North American operation in 2001, yielding net premiums written of US$898 million. The portfolio is well diversified both by line of business and contract type, the result of a concerted effort to shift away from the liability-dominated book of predecessor Zurich Reinsurance (North America), Inc. Our efforts to diversify our underwriting portfolio will continue as we build a balanced, multi-faceted service platform focused on skilled underwriting, broad expertise and innovative solutions to clients' varied challenges.

Converium's diversity reflects the Group's resolve: 2001 was a year of re-underwriting and repositioning. Converium North America cancelled or did not renew a significant part of its portfolio because the underlying business did not meet our performance hurdles. Nonetheless, working with our brokers, we were able to develop a significant portfolio to replace the business that was not renewed.

Converium North America's liability reinsurance portfolio was transformed in 2001. Re-underwriting action was taken to reduce the amount of business where price is the chief driver of purchasing decisions, and towards increased profitability. A significant proportion of the liability treaties that we did not renew were umbrella or high excess severity business. However, casualty continues to be Converium North America's largest line, contributing 24 % of 2001 net premium income. Converium North America remains one of the most important liability reinsurers in the US.

Professional liability lines are underwritten through close coordination and cooperation between underwriters in Zurich and New York. Underwriting is coordinated on a global basis. We continue to be viewed as a leading market reinsurer in this important segment of our business.

Catastrophe excess of loss treaties dominate Converium North America's property reinsurance portfolio, although we also write risk

-16-

excess and proportional programs. In all, property accounts for about 16% of the North American book.

Our gross loss in North America from the World Trade Center is US$ 155 million, of which US $70 million is in property lines and US$ 85 million is in liability and workers compensation lines. **Relative to our market share, our North American property loss is favorable in comparison to our major competitors**. We were not underwriters of property facultative risks in North America, and we wrote very little property risk excess business during the soft market.

The market's potential exposure to toxic mold is a significant risk to the industry. Our approach has been to study and evaluate the exposure with the utmost underwriting discipline and to price for it.

Workers' compensation is an important US business segment for Converium, contributing 22% to North American net premium income. Our focus is on regional and single-state clients, rather than large national accounts, since the latter are more difficult to assess with precision and therefore to price satisfactorily. It is a changing market, however, especially following September 11. The loss pointed out with absolute starkness the aggregation risk inherent in workers' compensation, a risk that previously had been almost completely ignored.

Regional facultative programs and specialty lines predominate the motor book. The US motor market, particularly commercial trucking, has been under priced for a very long time, but the tide is turning.

The year in review is notable for a concerted move into targeted specialty lines, where knowledge, experience and innovation are paramount. For example, the accident and health account continues its solid growth. Converium North America entered the line after assuming responsibility for this class of business in the US from Converium's Cologne office in 2000. A strong team of local underwriters was hired, whose focus is primarily on less volatile employers' stop-loss reinsurance.

As home to the Group Center of Excellence for agribusiness, Converium North America recruited a team of specialists in 2000. The business, while still small in relation to our total portfolio, recorded US$ 32 million of net premiums in 2001 and was profitable in its first full year of operation, an excellent achievement. We anticipate additional growth in the US market and plan to deploy

Converium's agribusiness expertise in other markets around the globe.

Our New York-based credit and surety underwriter, working in close collaboration with the Zurich Center of Excellence for credit and surety, has been developing and expanding the portfolio of US accounts.

Our Risk Strategies underwriting division represents our non-traditional team and is staffed with highly specialized professionals with experience in underwriting, actuarial, accounting, tax and legal. In 2001, it represents approximately one third of the net premiums of Converium North America.

Against this backdrop of re-underwriting, diversification and new success for Converium North America, the US reinsurance market in general has also been undergoing a transition. The turn began to take hold during mid-year renewals. Liability prices began to rise, particularly in the specialty lines where Converium's focus is concentrated. Catastrophe business had been more attractive throughout, but it, too, was expected to improve. The aftermath of the enormous losses incurred at the World Trade Center on September 11 brought about a dramatic acceleration in the rise of reinsurance prices.
(Emphasis added.)

31.     Commenting on these results, defendant Lohmann stated:

"Converium entered 2002 as an established and integrated leading global reinsurer with a strong client focus and determination to deliver shareholder value. We were well received as an independent company during the recent January 1, 2002 renewal season by both clients and brokers. Terms and conditions have improved substantially on a global scale and we have further enhanced the quality of our portfolio. 2001 was a year of transition for Converium, as we carved out three distinct businesses from our former parent company, Zurich Financial Services, and spun off Converium through an Initial Public Offering on December 11, 2001."

32.     On May 23, 2002, Converium filed its annual report with the SEC on Form 20-F. The Company's Form 20-F was signed by the Individual Defendants and reaffirmed its previously announced financial results.  With respect to the adequacy of its reserves, the Company stated:

-18-

Adequacy of Reserves

Given the inherent uncertainty of the loss estimation process described above, we employ a number of methods to develop a range of estimates. On the basis of our actuarial reviews we believe our liability for gross losses and loss adjustment expenses, referred to as gross reserves, and our gross reserves less reinsurance recoverables for losses and loss adjustment expenses ceded, referred to as net reserves, at the end of all periods presented in our financial statements were determined in accordance with our established policies and were reasonable estimates based on the information known at the time our estimates were made. These analyses were based on, among other things, original pricing analyses as well as our experience with similar lines of business and historical trends, such as reserving patterns, exposure growth, loss payments, pending levels of unpaid claims and product mix, as well as court decisions and economic conditions. However, since the establishment of loss reserves is an inherently uncertain process, the ultimate cost of settling claims may exceed our existing loss and loss adjustment expense reserves, perhaps materially. Any adjustments which result from changes in reserve estimates are reflected in our results of operations.

Since reserving is an inherently uncertain process, we retained, in the second quarter of 2001, the actuarial consulting firm Tillinghast-Towers Perrin, or Tillinghast, to perform an independent review of our non-life net reserves as of December 31, 2000. In their analysis, Tillinghast relied on data available at the time we issued our December 31, 2000 financial statements, and also on certain information that became available subsequently. Tillinghast relied on us as to the accuracy and completeness of this data and information. Based on the Tillinghast analysis, which reflected certain information that became available after the issuance of our December 31, 2000 financial statements and based on our own evaluations of these new developments, we recorded in the first half of 2001 additional provisions of $112 million, net of reinsurance, principally related to accident years 2000 and prior at Converium North America. Tillinghast has confirmed to us that our net reserves as of December 31, 2000 plus the first half of 2001 reserve strengthening correspond to Tillinghast's best estimate of our liabilities for net loss and loss adjustment expenses as of December 31, 2000 for Converium on a consolidated basis. Tillinghast has not conducted a review with respect to our reserves subsequent to December 31, 2000.

The $112 million reserve strengthening discussed above was determined in accordance with our loss reserving policies as described in "— Establishment of Loss and Loss Adjustment Expense Reserves", and was recorded in accordance with our established accounting policies as described in Note 2(c) of our financial statements. Under these policies we review and update our reserves as experience develops and new information becomes known, and we bring our reserves to a reasonable level within a range of reserve estimates by recording an adjustment in the period when the new information confirms the need for an adjustment. The Tillinghast review was begun during the second quarter of 2001 and completed in the third quarter. Tillinghast actuaries had conducted similar reviews for other insurers and reinsurers and were able to refer to their proprietary loss development data. Tillinghast also used several top-down approaches including their broad database of insurance and reinsurance loss trends. Tillinghast actuaries and our Converium actuaries were also able to access information that was not known in the first quarter of 2001 when we completed our year-end 2000 financial reporting to Zurich Financial Services. This information included most fourth quarter 2000 and some first quarter 2001 reports from our ceding companies who typically report on a one-quarter lag. Analyses of these reports in relation to earlier periods' reports, disclosed adverse loss development across several lines of business, mainly relating to general liability, commercial auto liability and umbrella policy business written in 1996 through 1999. We reviewed and evaluated this new information as we completed our first half 2001 financial reporting. Our revised estimate of reserves, based mainly on the new ceding company reported data, was in line with Tillinghast's principally top-down reserve estimate within its range of estimates. Accordingly, we recorded an adjustment to loss and loss adjustment reserves at that time.

In the second half of 2001 we recorded an additional $11.6 million of net adverse loss development.

33.     On July 29, 2002, Converium reported on its financial results for the first six months of 2002.  Converium reported an operating income of $103.7 million and a net income of $31.6 million for the first six months of 2002, compared to an operating loss of $26.1 million and a net loss of $60.5 million respectively, for the first half of 2001.  With respect to its financial results, the Company stated:

Strong balance sheet to further harvest in hardening markets:

- Strong capitalization (equity: US$ 1,663.9 million)
- September 11: net loss capped at US$ 289.2 million
- Asbestos and environmental loss reserves of US$ 47.3 million represent less than 1% of loss reserves (survival ratio of 13.8 years)
- **Strong reserve levels maintained**
- Enron exposure: full aggregate limits booked as incurred loss in 2001
- Losses realized on the sale of WorldCom fixed income investments were US$ 15.8 million pre-tax
- Enron and WorldCom: low exposure to directors' and officers' liability policies (D&O liability).
(Emphasis added.)

34.    Commenting on these results, defendant Lohmann stated:

"While we earmarked the year 2001 as the year of transition, our first ever half-year report provides us with the opportunity to confirm that Converium has taken off to a successful start as an independent, publicly listed reinsurer. Converium has enjoyed strong support from both clients and brokers, as is reflected in our written premium figures. Much of this growth has come from our specialty lines. This is pleasing, as it has been a focus over the last few years to reposition Converium as a leader in these segments. This repositioning in specialty lines together with our re-underwriting efforts are now beginning to show up in our technical result, where the combined ratio has improved to 101.0%.

The adverse developments in capital markets, together with the scandals at renown large corporations, have led to a widespread loss of confidence in financial accounting and an increasing focus on strong corporate governance. At Converium, corporate governance has played an important role from our inception. Consequently, several important requirements, which today are in the limelight of discussions on good corporate governance, were incorporated within Converium from the beginning, allowing us to be essentially in line with the newly proposed SEC criteria."

35.    On October 28, 2002, Converium reported pre-tax operating income of $32.5 million for the nine months ended September 30, 2002.  This represented an increase of $403.3 million compared to the pre-tax operating loss of $370.8 million for the same period of 2001.  Converium

-21-

Group reported a cash flow from operating activities of$612.3 million for the nine months ended

September 30, 2002 compared to$396.7 million for the nine months ended September 30, 2001.

With respect to the status of the Company's reserves, the Company stated:

> During the third quarter, recognition of net reserve developments has led to prior year reserve strengthening of US$ 59.6 million, including US$ 47.0 million recorded by Converium North America and US$ 12.6 million recorded by Converium Cologne. During the first nine months of 2002, Converium Group has recorded a total US$ 84.0 million provision for net reserve development on prior years' business, representing a movement of 2.0% of the net non-life reserves at December 31, 2001.

> After years of reporting significant net reserve releases, many primary US insurance companies are now confronted with reserve insufficiencies relating to the soft market period of 1997-2000. In recent quarters, the recognition of prior year reserve development on the side of primary insurance companies has put pressure on the reinsurance industry.

> During the third quarter of 2002, Converium North America noted the continued emergence of increased loss experience related to prior years, leading to the reserve increase mentioned above. The emergence was concentrated in the casualty lines, especially in miscellaneous professional liability (nursing homes), automobile excess, medical excess, umbrella and miscellaneous casualty. The majority of the affected contracts were already non-renewed in the years 2000 and 2001, as part of a major re-underwriting process.

> Based on the latest loss information reported by its ceding companies, Converium Group is currently conducting further actuarial studies. **Preliminary findings suggest that additional reserve actions of up to US$ 75.0 million will be required for the 4th quarter 2002.** Converium Group will report on this in detail during the fourth quarter, as soon as the mentioned actuarial studies are complete.
> (Emphasis added.)

36.    Commenting on these results, defendant Lohmann stated:

> The reserve actions undertaken in the second half of 2002 represent a challenge that I would rather not have to face, but it is one that I

-22-

believe the management and staff of Converium will master. Our situation is not much different from that of the rest of the market and many of our competitors face the same issues. The question is how long they can avoid or hide the truth. I firmly believe that this step will prove to be the precursor of further adjustments within the industry.

Converium is facing pressure from prior years and contracts that from an underwriting standpoint we left long behind us. However, it is the nature of our business that problems surface with a significant time lag. **We are proactively addressing the issues, and taking the pertinent measures to solve them.**

Our current business, particularly our specialty lines such as aviation, accident & health, agribusiness and professional indemnity, is performing excellently. In addition, the outlook for the reinsurance industry in 2003 continues to look good with a continued hardening of markets, increasing demand and increasing prices. Converium is making excellent progress in positioning the group within various markets in which it operates. Converium is being well received and sought out by existing and new clients. [Emphasis added.]

37.    On November 19, 2002, Converium updated on the additional provisions for prior years' liability lines written by Converium North America in 1997 to 2000 to be recorded in the fourth quarter 2002.  In its press release dated October 28, 2002, Converium pre-announced that additional provisions for liability business written by Converium North America in 1997 to 2000 of up to $75.0 million would be recorded during the 4th quarter 2002.  Converium North America had finalized its loss reserve analysis that would result in the recording of additional provisions for losses on its commercial umbrella, miscellaneous casualty (particularly professional liability, nursing homes), medical errors & omissions liability, motor liability, and workers' compensation lines of business of $70.3 million net for the fourth quarter 2002, which are in addition to the $47.0 million that were recorded during the third quarter 2002.  More specifically, the Company stated:

These additional provisions are the result of the continued emergence of increased reported losses versus expected losses related to prior

-23-

years. These additional provisions of a total of US$ 117.3 million net recorded in the second half of 2002 are in relation to:

US$ 35.7 million for Commercial Umbrella, non-proportional written in UWY 1997 to 2000

US$ 31.2 million for Miscellaneous Casualty, non-proportional written in UWY 1997 to 2000

US$ 18.6 million for Medical Errors & Omissions Liability, non-proportional written in UWY 1997 to 2000

US$ 17.0 million for Miscellaneous Casualty, proportional written in UWY 1997 to 1999

US$ 16.8 million for Motor Liability, non-proportional written in UWY 1997 to 2000

US$ 14.6 million for Workers' Compensation, non-proportional written in UWY 1997 to 2000

US$ 3.0 million for Motor Liability, proportional written in UWY 1999 to 2000

Partially offsetting these additional provisions, the in-depth analysis of the liability book written by Converium North America also resulted in a reduction of US$ 19.6 million of the reserves of two large Workers' Compensation-proportional accounts written in UWY 1998 to 2001 due to favorable loss-developments.

As per September 30, 2002, Converium North America held total loss and loss adjustments reserves, net, of US$ 1,989.2 million, which incorporate US$ 904.8 million of case reserves net and US$ 1,084.4 million of IBNR net. The additional provisions of US$ 70.3 million recorded in the 4th quarter 2002 relate to IBNR. Since the fourth quarter 2000, Converium recorded a total of US$ 382.2 million net of additional provisions for prior years' liability lines of Converium North America written in 1997 to 2000 (2000: US$ 81.0 million; 2001: US$ 164.0 million; 1st half 2002: US$ 19.9 million; 3rd quarter 2002: US$ 47.0 million; 4th quarter 2002: US$ 70.3 million).

As a result of increasing rates and tightening terms and conditions Converium expects a continuing improvement in the underwriting performance of the in-force non-life business. In particular, the effect

of rate increases post September 11th and the relatively low frequency of major airline losses in accident year 2002 so far indicate that losses in Converium's aviation business appear to be low in comparison with past experience. Converium thus believes that the additional reserve actions in Converium North America are likely to be offset by a continued improvement in the in-force business during the 4th quarter coupled with favorable earnings in the aviation business, which may emerge in the fourth quarter 2002. These favorable earnings could, however, be affected by final reporting by ceding companies for major losses of a catastrophic nature which may occur between the date of this press release and the end of the year 2002.

38.    Commenting on the news, defendant Lohmann stated:

> **The steps taken in the third and fourth quarter underline Converium management's determination to confront emerging reserve issues in a forthright and proactive manner. As a result, I am confident that the underlying earnings power of our in-force business will manifest itself**. [Emphasis added.]

39.    On February 11, 2003, Converium reported on its successful 2003 renewal and on its financial results for the fourth quarter 2002, as well as, for the full year 2002. Converium reported a net income of $106.8 million for 2002, and a net income of $80.8 million for the fourth quarter of 2002. With respect to its reserves, the Company stated:

> After years of reporting significant net reserve releases, many primary US insurance companies are now confronted with reserve insufficiencies relating to the soft market period of 1997 to 2000. In recent quarters, the recognition of prior years' reserve development on the side of primary insurance companies has put pressure on the reinsurance industry.
>
> During the fourth quarter 2002, the recognition of net reserve developments of US$ 70.3 million has led to prior years' reserve strengthening of total US$ 148.5 million net for our non-life business in 2002, of which US$ 137.2 million was recorded by Converium North America, US$ 31.1 million by Converium Cologne, partially offset by positive reserve development of US$ 19.8 million recorded by Converium Zurich.

*\*\**

Converium Group reported a reserve increase on a closed block of long-term variable annuity business. The variable annuity losses arise from guaranteed minimum death benefit contracts, whereby the minimum benefit is determined by the development of investment results from the capital markets. Following the ongoing downturn of the international equity markets, reserve strengthening of US$ 15.6 million, of which US$ 14.4 million was recorded in the fourth quarter, was required in order to align the reserves to the expected future benefits. In addition to that, claims in the amount of US$ 12.5 million (2001: US$ 3.3 million) were paid in the year 2002 against net premiums earned of US$ 8.1 million (2001: US$ 4.5 million) regarding this closed block of long-term variable annuity business.

40.     Commenting on these results, defendant Lohmann stated:

Our industry has seen considerable turmoil during 2002 with several involuntary exits and restructurings of major players in our industry having been announced. Our expectation is that this trend will continue on into 2003. Converium, with its strong balance sheet and clear positioning as a leading independent reinsurer, is emerging as a winner from this industry shakeout.

In an industry where people matter, Converium's focus on enhancing its skill base with underwriting specialists and strong analytical capabilities paid dividends in 2002. This can be witnessed in our strong growth and the improved core profitability of our underlying business. It can also be seen in our successful penetration of several Continental European markets in 2003 where relationships and own distribution capabilities matter.

January's renewals continued to benefit from a robust pricing environment for reinsurers. Terms and conditions, particularly commissions for pro rata business, continued to improve in reinsurers' favor. The strong growth experienced by Converium on January 1 should, in the absence of major catastrophes, bode well for a continuation of the profitability trend observed in late 2002.

41.     On April 18, 2003, Converium filed its annual report with the SEC on Form 20-F. The Company's Form 20-F was signed by the Individual Defendants and reaffirmed its previously announced financial results.  With respect to the adequacy of its reserves, the Company stated:

Given the inherent uncertainty of the loss estimation process described above, we employ a number of methods to develop a range of estimates. On the basis of our actuarial reviews we believe our liability for gross losses and loss adjustment expenses, referred to as gross reserves, and our gross reserves less reinsurance recoverables for losses and loss adjustment expenses ceded, referred to as net reserves, at the end of all periods presented in our financial statements were determined in accordance with our established policies and were reasonable estimates based on the information known at the time our estimates were made. These analyses were based on, among other things, original pricing analyses as well as our experience with similar lines of business and historical trends, such as reserving patterns, exposure growth, loss payments, pending levels of unpaid claims and product mix, as well as court decisions and economic conditions. However, since the establishment of loss reserves is an inherently uncertain process, the ultimate cost of settling claims may exceed our existing loss and loss adjustment expense reserves, perhaps materially. Any adjustments that result from changes in reserve estimates are reflected in our results of operations.

In 2002, we strengthened reserves by $148.5 million. Throughout the year, increased loss experience related to prior years continued to emerge. These additional provisions are the result of the continued emergence of increased reported losses versus expected losses related to prior years. As a result of actuarial work performed at Converium North America through the third and fourth quarters, management concluded that ultimate losses would most likely be higher in the range of possible outcomes than previously estimated. During 2002, Converium North America engaged in an in-depth actuarial reserve analysis of certain lines of business, which resulted in an increase of $137.2 million of provisions for net losses, primarily related to underwriting years 1997 through 2000, on the commercial umbrella, miscellaneous casualty, medical errors and omissions liability and motor liability lines of business. Converium Cologne recorded $31.1 million of additional loss provisions related to prior years business, of which $25.4 million was related to run-off business. Partially offsetting this reserve strengthening, Converium Zurich recorded $19.8 million of positive reserve development in 2002 resulting from favorable development on prior year liability business and property excess of loss business from underwriting year 2001.

The reserve strengthening of $148.5 million in 2002 as described above and the $123.6 million in 2001 as described below in the "Loss

Reserve Development" section was determined in accordance with our loss reserving policies as described in "- Establishment of Loss and Loss Adjustment Expense Reserves", and was recorded in accordance with our established accounting policies as described in Note 2(c) of our financial statements. Under these policies we review and update our reserves as experience develops and new information becomes known, and we bring our reserves to a reasonable level within a range of reserve estimates by recording an adjustment in the period when the new information confirms the need for an adjustment.

42.    On April 29, 2003, Converium reported its financial results for the first quarter of 2003.  For the three months ended March 31, 2003, Converium reported a pre-tax operating income of $26.4 million, compared to $39.1 million for the same period in 2002.  For the first quarter of 2003, the net income (after-tax) of $25.5 million compares to $28.7 million for the first quarter of 2002, a decrease of $3.2 million or 11.1%.  With respect to its reserves, the Company stated:

**No material net developments of prior years' reserves None of Converium's non-life business segments (Converium Zurich, Converium North America, Converium Cologne) reported any material net developments of prior years' reserves in the first three months of 2003.** [Emphasis added.]

43.    Commenting on these results, defendant Lohmann stated:

The reshuffling of the reinsurance league table continues as we expected. Outside the United States and with the exception of property cat lines we rarely run into the new markets established in Bermuda. Local market expertise and access to the decision makers of the direct insurers matter. The 2003 renewals so far are clear evidence that Converium is fully established as an independent leading global reinsurer and is emerging as a winner out of the shake out-situation in our industry.

I am very pleased by the development of our non-life operations; a combined ratio of 98.3% and no material net adverse developments from prior years are the clear result of our re-underwriting efforts and the reserve actions we took in the last years. I am personally disappointed by the continuous emergence of additional reserve requirements for our GMDB-book - business underwritten several

-28-

years ago. Particularly, since our new life business is developing favorably.

44.     On July 29, 2003, Converium reported on its financial results for the second quarter 2003. Converium reported an operating income of $61.9 million for the second quarter of 2003. The Company reported a net income of $59.1 million for the second quarter of 2003, an increase of $56.2 million compared to the same period of the previous year, and earnings per share of $1.48, plus $1.41 compared to the second quarter of 2002.  Commenting on these results, defendant Lohmann stated:

> Today, Converium is fully established as an independent leading global multi-line reinsurer and continues to benefit from the reshuffling in the reinsurance industry. The hardening of the reinsurance markets, the strength of our global franchise and infrastructure, and opportunities arising from our position as a global player all led to a profitable growth in non-life, both in specialty lines and in standard property & casualty reinsurance. In order to prepare Converium for the 2004-renewals, we are currently reviewing strategies that will allow us to proactively manage the cycle in the reinsurance market place.
>
> I am pleased by the continuing improvement of the underlying profitability of our non-life operations; a combined ratio of 99.1% for the second quarter of 2003, respectively of 98.7% for the first half of 2003 - an improvement of 0.8 percentage points, respectively 2.3 percentage points - is the clear result of our re-underwriting efforts and reflects Converium's shift to longer-tail business, both in specialty lines and in standard property & casualty reinsurance.
>
> For the second quarter 2003 we achieved an annualized return on equity of 13.6% after-tax that reflects the profitability threshold applied in pricing.
>
> Converium's strong performance, as evidenced by the continuing improvement in the underlying profitability of our non-life operations and growth in shareholders' equity, is proof that our strategy of focusing on specialty lines and growth opportunities in the European market is bearing fruit.

45.     On October 28, 2004, Converium reported on its financial results for the third quarter 2003 and for the first nine months of 2003.  The Company reported net income of $44.3 million and $128.9 million for the three and nine months ended September 30, 2003, respectively, representing increases of $ 49.9 million and US$ 102.9 million versus the same periods in 2002.  The increases were due to continued improvements in the non-life underwriting results, as well as pre-tax net realized capital gains in 2003 versus pre-tax net realized capital losses in 2002.  Converium reported pre-tax operating income of $56.4 million for the three months ended September 30, 2003, an increase of $127.6 million as compared to pre-tax operating loss of $71.2 million for the same period of 2002.  Commenting on these results, defendant Lohmann stated:

> Converium continued to benefit from the reshuffling in the reinsurance industry. The strong performance of our non-life segments, Standard Property & Casualty Reinsurance and Specialty Lines, continued and reflects Converium's strong global franchise and the disciplined execution of our strategy that allow us to benefit from the current attractive market conditions.
>
> We have as promised further addressed our GMDB reserving position in the third quarter. Following a series of claims audits, additional in-depth analyses and resulting enhancements to our models, we have strengthened our total net reserves by US$ 14.3 million to US$ 58.1 million. In addition we have secured the ability to call upon additional reinsurance protection of up to US$ 75.0 million in excess of the newly strengthened carried reserve levels as at September 30, 2003. We presently believe that this additional reinsurance protection provides adequate coverage to protect Converium against any significant movement in the key variables and assumptions within our existing models.
>
> The strong performance we continued to experience in Standard Property & Casualty Reinsurance as well as in Specialty Lines reflects Converium's global franchise as well as our strong distribution, both direct and via broker. Today, our portfolio is well diversified by lines of business, globally balanced by regions, and well spread between short-, mid-, and long-tail business. The disciplined execution of our strategy resulted in substantial cash

flows that drove the strong growth of total invested assets, the corresponding investment results will be a key value driver for future earnings.

46.     On February 17, 2004, Converium reported on its financial results for the fourth quarter 2003 as well as for the full year 2003.  Converium reported an operating income of $61.3 million, an increase of 74.1% over the prior year's period.  The net income (after-tax) in the fourth quarter of 2003 was $56.2 million and earnings per share were $1.41, resulting in a return on equity of 11.6%.  Converium's net income in the fourth quarter of 2002 contained a tax benefit of $21.3 million, primarily resulting from operating losses in the United States following increases in reserves for prior years' losses.  For the year ended December 31, 2003, Converium reported an operating income of $206.0 million, an increase of 204.3% over 2002.  The net income (after-tax) for the full year 2003 was $185.1 million and earnings per share were $ 4.65, resulting in a return on equity of 10.7%.  Converium reported an aggregate net operating income benefit of $31.3 million arising out of reserve releases for prior years' incurred losses.   Commenting on these results, defendant Lohmann stated:

> The substantial improvement in the full year 2003 operating income, absent the influence of tax and capital market fluctuations (e.g. impairment charges), is clear evidence of the good performance of our core activities which reflects our stringent underwriting discipline and the current favorable market environment.  In addition to the positive financial results for 2003, the cash flows generated through the continuing growth in longer-tail lines and lower paid loss ratios increased total invested assets plus cash and cash equivalents by US$ 1.3 billion to US$ 7.8 billion.  Although our non-life combined ratio has improved by 5.8 percentage points to 97.9% it is not fully reflective of the expected profit to be generated by the underwriting activities of the 2003 calendar year because a substantial part of the expected longer-tail business' profitability should emerge as investment income in future periods.  This is why the growth in operating cash flows is such an important performance metric.

Converium walks the talk: The strict underwriting discipline and cycle management have been further enhanced by the appointment of the Chief Risk Officer and the Chief Technical Officer to the Global Executive Committee. The 2004 renewals so far reflect Converium's prudent underwriting. We did not relax our pricing targets or underwriting standards. This resulted in a moderate rate of growth in gross premiums written but should, absent any extraordinary shock losses, have a positive influence on the development of Converium's operating performance.

47.    On April 9, 2004, Converium filed its annual report with the SEC on Form 20-F. The Company's Form 20-F was signed by the Individual Defendants and reaffirmed its previously announced financial results. With respect to the adequacy of the loss reserves, the Company stated:

Given the inherent uncertainty of the loss estimation process described above, we employ a number of methods to develop a range of estimates. On the basis of our actuarial reviews, we believe our liability for gross losses and loss adjustment expenses, referred to as gross reserves, and our gross reserves less reinsurance recoverables for losses and loss adjustment expenses ceded, referred to as net reserves, at the end of all periods presented in our financial statements were determined in accordance with our established policies and were reasonable estimates based on the information known at the time our estimates were made. These analyses were based on, among other things, original pricing analyses as well as our experience with similar lines of business, and historical trends, such as reserving patterns, exposure growth, loss payments, pending levels of unpaid claims and product mix, as well as court decisions and economic conditions. However, since the establishment of loss reserves is an inherently uncertain process, the ultimate cost of settling claims may exceed our existing loss and loss adjustment expense reserves, perhaps materially. Any adjustments that result from changes in reserve estimates are reflected in our results of operations.

Unforeseen losses, the type or magnitude of which we cannot predict, may emerge in the future. These additional losses could arise from newly acquired lines of business, changes in the legal environment, extraordinary events affecting our clients such as reorganizations and liquidations or changes in general economic conditions. We continue to conduct pricing and loss reserving studies for many casualty lines of business, including those in which

preliminary loss trends are noted. In 2003, there was $31.3 million net positive development on prior years' loss reserves, consisting of positive development of $49.4 million in the Standard Property & Casualty Reinsurance segment, offset by $18.1 million of adverse development in the Specialty Lines segment. Risk diversification is a basic risk management tool in the insurance and reinsurance industry; as a multi-line reinsurer there are always likely to be reserve adjustments at the line of business level. Our book of business is broadly diversified by line of business as well as balanced by region and by the expected duration of its claims obligations.

The reserve strengthening of $148.5 million in 2002 and $123.6 million in 2001 as described below in the " — Loss Reserve Development" section was determined in accordance with our loss reserving policies as described in "— Establishment of Loss and Loss Adjustment Expense Reserves", and was recorded in accordance with our established accounting policies as described in Note 2(c) of our financial statements. Under these policies, we review and update our reserves as experience develops and new information becomes known, and we bring our reserves to a reasonable level within a range of reserve estimates by recording an adjustment in the period when the new information confirms the need for an adjustment.

48.     On April 29, 2004, Converium reported an operating income of $77.2 million, an increase of 192.4% over the prior year's period.  Net income for the first quarter of 2004 was $65.7 million, earnings per share were $1.65, resulting in a return on equity of 12.6%, an improvement of 6.7 percentage points compared to the same period of the previous year.  Commenting on these results, defendant Lohmann stated:

"The first quarter operating income is the best Converium has thus far reported in its history.  I am encouraged by the continuing improvement in the combined ratio as well as the growth in our investment results, which are developing as we had anticipated.

We are carefully observing the consolidation process unfolding in the reinsurance industry.  Depending on opportunity, Converium is ready to play an active role in this process - in a way that is accretive to our shareholders and without assuming material legacy issues."

49.     With respect to its reserves, the Company stated:

> In the first quarter of 2004, Converium reported net strengthenings of prior years' reserves of US$ 43.0 million (0.8% of Converium's non-life net reserves as per March 31, 2004), US$ 10.1 million in the Standard Property & Casualty Reinsurance segment and US$ 32.9 million for the Specialty Lines segment, compared to net strengthenings of US$ 11.3 million for the same period of 2003.

50.     The statements contained in ¶¶ 25-49 were materially false and misleading when made because failed to disclose or indicate the following: (1) that Converium maintained inadequate loss reserves in its Converium North America subsidiary; (2) that the Company did, contrary representations, establish adequate loss reserves to cover claims by Converium North America policy holders; (3) that reserve increases announced by the Company during the Class Period were materially insufficient; and (4) as a consequence of the understatement of loss reserves, Converium's earnings and assets were materially overstated at all relevant times.

## The Truth Begins to Emerge

51.     On July 20, 2004, Covernium announced that second quarter results would be impacted by a reserve strengthening for US casualty business and subsequent asset impairments on the balance sheet of Converium Reinsurance.  More specifically, the Company stated:

> Converium's second quarter results will fall short of expectations due to higher than modeled US casualty loss emergence primarily related to the underwriting years 1997 to 2001. Reserves for these lines of business, in particular umbrella, professional liability and Excess & Surplus Lines casualty, will be bolstered by up to US$ 400 million. This reserve action triggers net impairments of up to US$ 289 million of Deferred Tax Assets and US$ 94 million of Goodwill in the balance sheet of Converium Reinsurance (North America) Inc.

> On April 29, 2004 Converium announced that first quarter reported losses from prior year US casualty business had exceeded expected loss emergence. In the same press release, Converium also stated the expectation that the volatility of longer-tail risks was likely to persist for some time. This adverse loss reporting trend has continued and accelerated in the second quarter of 2004. Converium's decision to

-34-

increase reserves at this time should be seen in the context of an ongoing reserve strengthening for prior years at US primary insurance companies, triggered, in part, by the increased pressure for enhanced disclosure.

In response to the loss developments observed in the last quarters, Converium has initiated additional reviews of the US casualty business in order to examine the adequacy of prior years' provisions from an integrated actuarial, underwriting and claims perspective. At this point in time these ongoing internal reviews indicate a potential overall reserve shortfall relating to Converium's US casualty business of up to US$ 400 million. In addition, Converium has commissioned a leading firm of consulting actuaries to conduct a comprehensive and detailed external review. The outcome of their analysis will be communicated before the end of August.

Dirk Lohmann, CEO, said: "I am personally leading this comprehensive review with the assistance of our actuarial team and members of the newly created Underwriting Technical Services team under Gary Prestia's leadership. Let me stress that I am absolutely determined to put an end to this US casualty reserving saga."

The CEO added: "Although the latest set of reserve increases is a disappointment for all stakeholders, our ongoing business is performing well and our franchise in the global reinsurance markets remains strong. We have a new and better business model and a strengthened management team. The problems of the past have been isolated and are being addressed. With the impairment of the Deferred Tax Asset and the Goodwill on the North American balance sheet, the last of the legacy issues from the old Zurich Re have been eliminated. Over the next few weeks we will explore all options for maintaining Converium's strong capitalization, including the raising of additional capital, in order to meet the objectives of our shareholders, clients, intermediaries and other stakeholders."

Martin Kauer, CFO, said: "The rating agencies and most investment analysts do not fully consider soft assets such as Deferred Tax Assets and Goodwill when evaluating the value of a company. They focus on the net tangible book value, which excludes these two balance sheet items. From an economic perspective the North American Deferred Tax Asset will no longer be on Converium's consolidated balance sheet; from a tax perspective, however, we may be able to offset any future profits against these tax losses, thus reducing significantly our future tax rate."

52.     News of this shocked the market. Shares of Converium fell $11.12 per share, or 44.44 percent, on July 20, 2004, to close at $13.90 per share.

## POST CLASS STATEMENTS

53.     On August 31, 2004, Converium announced that the Company had comprleted external actuarial review of Converium's reserves.  More specifically, the Company stated:

> In order to obtain an external review of its overall reserve position, Converium commissioned the actuarial consulting firm Tillinghast-Towers Perrin ("Tillinghast") to perform an independent actuarial review of its non-life reserves as of June 30, 2004 in respect of the Zurich and New York originated businesses. These reserves amount to US$ 6.8 billion and represent 94.9% of Converium's total reserves. Tillinghast's analysis was based on data available at the time Converium issued its second quarter 2004 financial statements supplemented by recent commutations. Tillinghast have relied on the accuracy and completeness of this data and information provided for their analysis. Tillinghast note that there is inherent uncertainty with any estimation of loss reserves. Actual results may vary from the estimates.
>
> As a result of their independent review, Tillinghast have concluded that Converium's overall net reserves as of June 30, 2004, in total, for the segments reviewed, are below their point estimate, but fall within a range of reasonable actuarial estimates. Tillinghast's point estimate for the relevant businesses exceeds Converium's carried reserves as of June 30, 2004 by US$ 212.9 million or by approximately 3.2%. Converium's equity as of June 30, 2004 was US$ 1.35 billion. The Tillinghast review was performed on Converium's overall net reserves for the segments of business analyzed. Tillinghast have not expressed an opinion on the reserves at the statutory entity level.
>
> Converium is taking Tillinghast's study under consideration and, following a detailed analysis of the specific recommendations, will consider making adjustments to carried reserves in the third quarter 2004 to reflect the new information received. Current estimates of anticipated adjustments indicate that a further strengthening of overall net reserves by between US$ 50 million and US$ 100 million may be appropriate in order to bring Converium's carried reserves closer to Tillinghast's point estimate. The precise amount of reserve increase and the resulting financial impact on Converium's

consolidated financial statements is dependent upon ongoing commutation discussions. Since June 30, 2004, Converium has commuted US$ 176.8 million in loss reserves related to prior years' business assumed by its North American operation, Converium Reinsurance (North America) Inc. Currently, Converium Reinsurance (North America) Inc. is in negotiations with several clients for offers of commutations, and it is pursuing these diligently. A successful conclusion of such commutations may result in a further reduction in the difference between Tillinghast's point estimate and the Company's current level of reserves. The inability to conclude any additional commutations between now and the end of the third quarter would result in the reserve adjustment coming in at the higher end of the range indicated above.

In order to provide additional comfort as regards the reserve position, Converium entered into a retrospective retrocession agreement with National Indemnity Company, a Standard & Poor's AAA-rated member of the Berkshire Hathaway group of insurance companies. The retrospective retrocession agreement includes two layers, a US$ 150 million out-of-the-money layer, and a US$ 235 million in-the-money layer. The out-of-the money layer provides an additional US$ 150 million of cover against potential adverse reserve development on the underwriting years 2003 and prior, for all business written by Converium AG, Converium Reinsurance (North America) Inc. and Converium Insurance (North America) Inc. The cover of US$ 150 million attaches US$ 100 million in excess of the net reserves carried by these legal entities as of June 30, 2004. The retrocession also includes an in-the-money layer, a cession on a discounted basis of US$ 235 million of net reserves carried by these legal entities as of June 30, 2004. The out-of-the money cover will be accounted for on a risk transfer basis, respectively the in-the-money layer on a deposit accounting basis. The reinsurance charge for this retrocession is US$ 20 million. Converium has retained the right to commute the transaction on July 1, 2009, or thereafter at mutually agreeable terms.

*  *  *

North American business to be reorganized

While the overall strategy of the Company remains unchanged, Converium intends to implement changes to the way it is executed. In conjunction with the Company's goals to reduce exposure to highly capital-intensive lines of business in the US, Converium will

discontinue the local writing of long-tail specialty lines reinsurance from North America. Going forward, these lines will be written using Converium AG, Zurich, and its Bermuda branch as carrier. These steps are expected to result in a reduction of North American gross premium volume by up to US$ 500 million.

This new approach will be implemented by taking the following measures subject to regulatory approval:

Converium Reinsurance (North America) Inc., ("CRNA"), will be placed into orderly run-off and Converium will seek to commute CRNA's liabilities wherever adequate. The statutory surplus for CRNA as of 30 June, 2004 was US$ 394.1 million.

Converium intends to increase the shareholders' equity of Converium Insurance (North America) Inc., ("CINA"), by US$ 350 million. CINA will be made a direct operating subsidiary of Converium Holdings (North America) Inc., ("CHNA"). As a result of these actions, CINA's policyholders' surplus will be increased to over US$ 400 million. It is intended that CINA will become the issuing carrier for future local underwriting of Standard Property & Casualty Reinsurance, aviation insurance, agribusiness insurance/reinsurance, accident & health reinsurance and workers' compensation reinsurance.

In order to emphasize the core status of CINA within Converium, CINA will be granted a parental guarantee from Converium AG, Zurich.

Dirk Lohmann, CEO, said: "These organizational changes reflect a series of painful lessons learned from prior year casualty underwriting in the United States. A centralization of underwriting responsibilities for the long-tail specialty lines is expected to facilitate the implementation of rigorous and globally consistent underwriting standards." He continued: "In addition, we believe that this course of action and the proposed changes to the legal entity structure will help ensure that Converium can continue to offer its clients and producers in North America a Converium entity with the highest financial strength rating possible."

Peter Colombo, Chairman of the Board of Directors, stated: "The Board of Directors has initiated and unanimously approved the course of action taken by management. We believe that the proposed capital increase is in the interest of our shareholders as it will help

safeguard Converium's strong franchise. The planned size of the share issue takes into account an independent assessment of Converium's reserve position as well as the various measures which reduce the Company's capital requirements. The Board will carefully monitor the implementation of the comprehensive and balanced set of financial, organizational and strategic measures announced today."

54. On September 2, 2004, Converium announced that following the announcement of the external reserve review's outcome and resulting capital measures, Standard & Poor's and A.M. Best have lowered their ratings on Converium and its subsidiaries.

55. On September 23, 2004, Converium issued the following statement with respect to the future of the Company:

Converium considering a range of strategic options

Following a careful examination of the Company's track record and franchise outside the United States, the Board of Directors of Converium believes that the Company has a viable business future as a professional reinsurer. In this context, Converium is considering a range of strategic options, which include a capital increase, a partnership, a strategic investment, or a combination thereof.

Non-US franchise historically a strong source of earnings

Converium has a track record of building profitable businesses in key markets such as Europe, Asia-Pacific and Latin America. Since Converium's Initial Public Offering (IPO) the Company has generated net income in excess of US$ 500 million excluding business underwritten by the North American entity. The Company believes that despite the set backs suffered in the United States, it continues to enjoy a strong and stable franchise among its customers in the remaining markets. An independent survey from Flashpoehler conducted in the first half of 2004 among European cedents indicates that Converium's clients rank the Company 3rd in terms of overall excellence among all reinsurers surveyed. Against this backdrop Converium's Board of Directors believes that the Company can continue to extract value from this franchise for the benefit of shareholders. As a consequence, a going concern on a stand-alone basis based on a capital increase remains a viable option.

-39-

Converium is committed to maintain maximum flexibility as regards strategic options

In considering all options to protect the Company's franchise and shareholder value, flexibility is an essential component of this process. A capital increase is a core ingredient in a number of these options. Converium is currently discussing a partnership or strategic investment with various parties. While some discussions are at a more advanced stage, additional time will be needed in order to diligently evaluate and compare all options when it comes to structures and terms. The progress of a number of discussions is dependent on assurances to the potential partners that the capital increase will be available.

Converium's Board of Directors stresses that the Company will only execute a capital increase that makes sense from a shareholder value and rating perspective and on underwriting terms that are acceptable to the Company.

The Board of Directors is proposing a flexible capital increase structure to the EGM

Against this backdrop, the Board of Directors proposes that shareholders approve a capital structure allowing a capital increase of up to $420 million for

a discounted rights issue for existing shareholders and, if appropriate, a tranche for a strategic investment or partnership for which pre-emptive rights are excluded.
Board of Directors seeks shareholder approval of the proposed capital increase

While the Board of Directors appreciates that several questions may remain outstanding, having the capital increase approved will give the Company the necessary flexibility to effectively evaluate all options. Not having approval will restrain Converium's strategic and tactical flexibility and may ultimately force the Company to consider alternatives which may not result in achieving an outcome that generates the best value for shareholders.

## UNDISCLOSED ADVERSE FACTS

-40-

56.     The market for Converium's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Converium's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Converium securities relying upon the integrity of the market price of Converium's securities and market information relating to Converium, and have been damaged thereby.

57.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Converium's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

58.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Converium's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Converium and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the

-41-

Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

59.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Converium, their control over, and/or receipt and/or modification of Converium allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Converium, participated in the fraudulent scheme alleged herein.

60.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

61.  At all relevant times, the market for Converium securities was an efficient market for the following reasons, among others:

(a) Converium stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Converium filed periodic public reports with the SEC and the NYSE;

(c) Converium regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Converium was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

62. As a result of the foregoing, the market for Converium securities promptly digested current information regarding Converium from all publicly-available sources and reflected such information in Converium stock price. Under these circumstances, all purchasers of Converium securities during the Class Period suffered similar injury through their purchase of Converium securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

63. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements"

when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Converium who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

64.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.   During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Converium securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

66.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud

and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Converium securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

67.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Converium as specified herein.

68.   These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Converium's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Converium and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Converium securities during the Class Period.

69.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation,

development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

70.  The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Converium operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

71.  As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Converium securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Converium publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and

misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Converium securities during the Class Period at artificially high prices and were damaged thereby.

72.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Converium was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Converium securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

73.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

74.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

75.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

-47-

76.   The Individual Defendants acted as controlling persons of Converium within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.   In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

78.   As set forth  above, Converium and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  October 4, 2004
        New York, New York

                                        **MURRAY, FRANK & SAILER LLP**


                                        By:_____S/_____
                                              Eric J. Belfi (EB-8895)
                                        275 Madison Avenue, Suite 801
                                        New York, New York 10016-1101
                                        (212) 682-1818

                                        **SCHIFFRIN & BARROWAY, LLP**
                                        Marc A. Topaz
                                        Richard A. Maniskas
                                        Tamara Skvirky
                                        Three Bala Plaza East, Suite 400
                                        Bala Cynwyd, PA  19004
                                        (610) 667-7706

                                        Attorneys for Plaintiff