UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
IN RE CONVERIUM HOLDING AG SECURITIES   :
LITIGATION                              :         MASTER FILE
                                        :      04 Civ. 7897 (DLC)
This Document Relates to:               :
                                        :       OPINION & ORDER
ALL ACTIONS                             :
                                        :
----------------------------------------X

Appearances

For plaintiffs:
Steven B. Singer
Avi Josefson
Mark D. Debrowski
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019

Robert M. Roseman
Spector Roseman & Kodroff, P.C.
1818 Market Street
Suite 2500
Philadelphia, PA 19103

Mark S. Willis
Cohen Milstein Hausfield & Toll, P.L.L.C.
1100 New York Avenue N.W.
Suite 500, West Tower
Washington, D.C. 20005

For defendants UBS AG and Merrill Lynch Int'l:
Douglas D. Broadwater
Francis P. Barron
John T. Zach
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019

For defendant Zurich Financial Services:
Ralph C. Ferrar
Jonathan E. Richman
John C. Letteri
LeBoeuf, Lamb, Greene & McRae LLP
125 West 55th Street
New York, NY 10019

For defendant Converium Holding AG and the Individual
Defendants:
Stephen W. Greiner
Richard Mancino
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019


DENISE COTE, District Judge:

     This action pertains to a dramatic drop in the stock price
of Converium Holding AG ("Converium"), a Swiss reinsurance
company.  Plaintiffs, who bring their claims on behalf of a
putative class of investors who purchased the company's stock
between the initial public offering in December 2001 (the "IPO")
and the collapse of Converium's North American business unit in
September 2004, claim that defendants intentionally manipulated
Converium's finances in order to disguise profound problems with
the business.  These problems were revealed when Converium was
forced to take hundreds of millions of dollars in charges to
cover previously undisclosed liabilities.

     Plaintiffs bring claims under the Securities Act of 1933
(the "Securities Act") and the Securities Exchange Act of 1934
(the "Exchange Act") against Converium, certain of its officers

and directors, and its former parent company.  They also bring
Securities Act claims against the lead underwriters of
Converium's initial public offering.  In three separately filed
motions, the defendants have moved to dismiss all of the claims
against them.  The motions brought by the former parent company,
the underwriters, and the directors are granted.  The motions
brought by Converium and its officers are granted in part.

Background

     The following facts are taken from the amended complaint
filed on September 23, 2005 and the documents to which it
refers, unless otherwise noted.  Prior to its December 2001 IPO,
Converium was a wholly owned subsidiary of defendant Zurich
Financial Services ("ZFS"), a Swiss corporation.  As a
multinational reinsurer, Converium's business is, in basic
terms, to provide insurance to other insurers.  Converium
collects premiums in exchange for exposure to claims made by the
insured companies, or "ceding insurers."  It sets aside a
portion of these premiums as "loss reserves," which represent
the amount the company estimates it will have to pay to cover
the ceding insurers' claims under the policies that have been
written to date.  Loss reserves for a given policy are
established when the contract is signed, and later revised as
claims are submitted and more detailed information becomes

available about the likely amount the reinsurer will have to pay under the policy.  Loss reserves are the largest expense item on Converium's income statement.  Here, the thrust of plaintiffs' claim is that defendants knew -- and hid from the investing public -- that Converium's loss reserves were hundreds of millions of dollars less than they needed to be to cover the company's exposure.

I. The Pre-IPO Business

According to the amended complaint, the problems were centered in the North American business unit of Converium, which did business as Zurich Re (North America) prior to the IPO.[1] Zurich Re (North America) and Converium North America were by far the largest business units of ZFS and Converium, respectively.  In 1998, when defendant Dirk Lohmann ("Lohmann") became the CEO of ZFS's reinsurance business, there were indications that losses under policies written by Zurich Re (North America) for the 1996 and 1997 policy years were significantly higher than expected and that the premiums being charged for those policies were insufficient to cover the

---

[1] From the IPO through October 2003, Converium had four operating units: Converium Life, which managed global life reinsurance; Converium Cologne, which oversaw non-life products in Germany, Africa, and the Middle East; Converium Zurich, which supervised the company's non-life business in Europe and Asia; and Converium North America, which managed non-life reinsurance in the United States and Canada.

claims.  Zurich Re (North America) monitored its business
through quarterly loss reserve studies that were presented to
defendants Lohmann, Martin Kauer ("Kauer"), Converium's CFO, and
Richard Smith ("Smith"), the CEO of Converium North America.[2]
According to plaintiffs, at the end of 2000, these studies
showed a reserve shortfall of at least $100 million.  And by
early 2001, it had become clear that there had been significant
underpricing in the 1998, 1999, and 2000 policy years as well,
and that Zurich Re (North America)'s reserve deficiency was a
severe problem.

As a result, ZFS decided to exit the reinsurance business.
In order to determine how to do so, it hired Tillinghast-Towers
Perrin ("Tillinghast"), an actuarial consulting firm, to provide
an independent estimate of the company's loss reserves.
Tillinghast performed separate studies of the North American and
German businesses of Zurich Re and in April 2001 determined that
Zurich Re (North America) was under-reserved by $350 million.[3]
According to the amended complaint, the Officer Defendants knew
that they could not conduct a sale or public offering of their
reinsurance business with such a large deficit, nor could they

---

[2] Collectively, Lohmann, Smith, and Kauer are referred to as the
"Officer Defendants."

[3]  Dollar figures have been rounded to the nearest million
throughout this Opinion.

increase the reserves by that amount, as it would undermine market confidence in the company's business.

Lohmann and Kauer decided that the maximum reserve increase that they could afford to make was $125 million, and they embarked on a campaign to "convince" Tillinghast that this would be sufficient.  Over the next few months, executives "pulled out every stop" and "worked [Tillinghast] to death."  In response, Tillinghast's estimate of the reserve deficit did indeed come down.  By the summer, it had dropped to $186 million, but "the Company's senior management knew that Tillinghast's original 'best estimate' of $350 million was accurate."[4]

Through a press release of September 6, 2001, Converium[5] announced that ZFS would be spinning off Converium in an initial public offering, stating that ZFS had selected this method for exiting the reinsurance business "following consideration of a number of alternatives."  The release also noted that Converium had added to its reserves earlier in the year:

---

[4] In Tillinghast's final report delivered in September 2001, the "best estimates" of ZFS's deficiencies were $162 million for the North American business and $157 million overall.  The amended complaint does not refer to the final version of the report, and plaintiffs have moved to strike references to it from the defendants' motion papers.  For the reasons explained below, the defendants are entitled to dismissal of the Securities Act claims and the Exchange Act claims based on the IPO even without considering the final report.

[5] Although the amended complaint asserts that ZFS and Converium jointly issued the press release, the release was, in fact, issued in Converium's name alone.

> During the second quarter of 2001, following an
> independent actuarial review, Converium undertook
> reserve strengthening amounting to $112 million.  As a
> result, Converium's loss reserves at Dec. 31, 2000
> correspond to the consulting actuaries' best estimate
> of provisions for net loss and loss adjustment
> expenses.

The strengthening consisted of a $125 million increase in North

American reserves and a $13 million decrease in European

reserves.

Converium was legally registered as an independent entity

on October 1, 2001.  As part of the "road show" presentation to

potential investors in the months that followed, Converium

stated that its loss reserves had been "thoroughly examined by

Tillinghast" and booked "at Tillinghast's 'best estimates.'"  It

also cited its high credit ratings -- "A+" from Standard &

Poor's and "A" from A.M. Best.  The prospectus prepared for the

IPO (the "Prospectus") echoed the claim that the loss reserves

were consistent with Tillinghast's best estimates, and stated

that the $112 million strengthening -- which had been undertaken

in response to "adverse loss development across several lines of

[Converium's] business mainly related to general liability and

umbrella policy business underwritten in 1996 through 1999" --

was sufficient to maintain the reserves at adequate levels:

> [The] reserve strengthening discussed above was
> determined in accordance with our loss reserving
> policies ... and was recorded in accordance with our
> established accounting policies as described in Note
> 2(c) of our historical combined financial statements.

> Our revised estimate of reserves, based mainly on the
> new ceding company reported data, was in line with
> Tillinghast's principally top-down reserve estimate
> within its range of estimates.

The Prospectus assured investors that Converium established its

reserves "on the basis of facts available at the time" and that

its reserves "were reasonable estimates based on the information

known at the time [the] estimates were made."  Investors were

warned, however, that the stated reserves might "prove to be

inadequate to cover our actual losses."  The registration

statement filed with the SEC in connection with the Converium

IPO (the "Registration Statement") incorporated the Prospectus

and was signed by each of the Officer Defendants and each of the

Director Defendants except Clarke.


II. The IPO

     The IPO, which was conducted on December 11, 2001, resulted

in the sale of 35 million shares of Converium stock at a price

of 82 Swiss Francs per share, or $24.59 per American Depository

Share ("ADS").[6]  The IPO generated approximately $1.76 billion in

---

[6] Each ADS represents one half of a share of Converium stock.
The ADS system is the means by which American investors hold and
trade equity interests in foreign companies.  In order for a
foreign corporation to trade on an American stock exchange, the
corporation must issue and deposit ADSs with an American
financial institution.  Kingdom 5-KR-41 LTD., v. Star Cruises
PLC, No. 01 Civ. 2946 (DLC), 2005 WL 1863832, at *1 (S.D.N.Y.
Aug. 8, 2005).  The depository institution then issues American

proceeds -- the largest IPO of a reinsurance company in history.
The two lead underwriters of the IPO, Merrill Lynch
International ("Merrill Lynch") and UBS AG ("UBS")
(collectively, the "Underwriter Defendants"), sold more than 11
million shares each and, along with the other underwriters,
shared fees of approximately $54 million.  On January 9, 2002,
ZFS issued a press release stating that it had sold its
remaining 5 million shares of Converium stock to the
Underwriters.  This move brought the total number of shares on
the market to 40 million, and left ZFS with no ownership stake
in Converium.

III. Post-IPO Problems

     Following the IPO, the North American business continued
its downward spiral.  Just 20 days after the offering, Converium
North America experienced an $80 million "adverse loss
development," meaning that, without further strengthening of
reserves, its reserve deficiency would grow by that amount.  In
each of the following quarters of the financial year,
Converium's actuaries identified additional adverse loss
developments.  This information was reported to Smith and passed
along to Lohmann and Kauer, who, despite being based in

---

Depository Receipts to the beneficial owners of the ADSs, who
may sell the ADSs on American securities exchanges.  Id.

Switzerland, directly reviewed and approved decisions regarding North American reserves.  Although the Officer Defendants authorized a total of $176 million in reserve increases for Converium North America in 2002, plaintiffs contend that they were aware that the reserve shortfall was in fact much greater. One internal Converium study concluded that at the end of 2002, Converium North America's loss reserves were still $293 million below the necessary level.  During the Class Period, Converium North America maintained reserves of approximately $2 billion.

By the spring of 2003, Converium's board had grown concerned with the reserving issues and retained B&W Deloitte ("Deloitte"), an actuarial consulting group, to conduct an independent study of Converium's loss reserves as of the end of 2002.  In May 2003, Deloitte presented its preliminary results, which showed that Converium North America had a $437 million deficit in its reserves.  This figure did not take into account certain problematic policies that required high reserves, and thus the company's true deficiency was likely even higher than Deloitte's initial estimate.  Even at the $437 million level, Deloitte's study indicated that Converium North America was carrying nearly 20% less in loss reserves than it should have. If Converium had disclosed this shortfall and increased its reserves by $437 million, it would have wiped out all of the

company's net income for 2002 and 2003 and resulted in a $145 million loss for that period.

Converium received additional bad news when, during the first half of 2003, Converium North America experienced a $340 million adverse loss development.  According to plaintiffs, this meant that Converium North America was under-reserved by $777 million as of June 30, 2003.  Instead of addressing these problems, Converium executives set out to disguise them.  In the second half of 2003, Converium announced that it would no longer report results by geographic segments, but by business segments.  This, according to plaintiffs, was an attempt to disguise the worsening fortunes of Converium North America.  In addition, Lohmann had some of Converium North America's worst policies transferred to Converium Zurich's books, and he increased the company's loss reserves by $155 million without public disclosure.  Plaintiffs claim that, notwithstanding these efforts, Converium North America was still under-reserved by at least $500 million at the end of 2003.[7]

---

[7] Plaintiffs' claims about the size of the alleged reserve deficiency at this point are not entirely consistent.  At one point in the amended complaint, Converium is said to have had a $500 million shortfall at the end of 2003, and elsewhere the deficiency is described as being "over $600 million" after the secret reserve increases.

IV. Post-IPO Public Statements

    Plaintiffs contend that, despite evidence that the outlook
for Converium North America was dire, Converium and its
executives publicly painted a very different picture of the
company's finances during this time.  In early 2002, Converium
made public its financial results for the year ending December
31, 2001.  The company reported a net loss of $367 million, but
downplayed the figure as being symptomatic of industry-wide
issues caused in large part by the September 11 attacks and the
Enron debacle.  In its 2001 annual report, Converium announced
that it had "recorded an addition of $11.6 million of net
adverse loss reserve development."  The press release in which
the results were reported claimed that Converium nonetheless had
"a very solid balance sheet" and had "substantially improved
[the] underlying adjusted non-life" business in 2001.[8]

    On July 29, Converium issued a press release announcing its
financial results for the first six months of 2002.  It reported
significant improvement over the previous year: Net income for
the period was $32 million, compared to a net loss of $61
million during the same months during the prior year.  The
company touted the results and asserted that Converium was
maintaining "[s]trong reserve levels."  With respect to

---

[8] Plaintiffs allege that Lohmann and Kauer signed many of
Converium's SEC filings during the Class Period, including the
Form 20-F in which the company reported these results.

Converium North America, the company also reported improvement:
The business unit booked a net loss of $18 million, compared to
a loss of $81 million during the same portion of the prior year.
This included a net adverse loss development of $20 million,
which represented the lion's share of the company's overall $24
million addition to its loss reserves.  On the same date,
Converium filed a Form 6-K with the SEC containing the same
financial results reported in the press release.  Lohmann's
letter to shareholders, included in the Form 6-K, stated that
the company was continuing "to closely monitor the adequacy of
our reserves for losses and loss adjustment expenses to uphold
high reserving standards."

     On September 6, Standard & Poor's issued a press release
announcing that it had affirmed Converium's A+ rating and
forecast "a significant improvement in operating performance"
for the full 2002 year.  On October 28, before trading in
Switzerland or New York opened, Converium issued a press release
announcing its financial results for the third quarter of 2002.
It reported a net loss of $6 million and noted that during the
quarter, Converium had increased its loss reserves by $60
million, $47 million of which was recorded by Converium North
America.  Converium also stated that, in light of the ongoing
effects of the "soft market period of 1997-2000," it would be
conducting further actuarial studies and anticipated adding up

to $75 million to its reserves in the fourth quarter.  In a

press release, Lohmann addressed the reserve adjustments:

> Our situation is not much different from that of the
> rest of the market and many of our competitors face
> the same issues.  The question is how long they can
> avoid or hide the truth.  I firmly believe that this
> step will prove to be the precursor of further
> adjustments within the industry.
>
> Converium is facing pressure from prior years and
> contracts that from an underwriting standpoint we left
> long behind us.  However, it is the nature of our
> business that problems surface with a significant time
> lag.  We are proactively addressing the issues, and
> taking the pertinent measures to solve them.

In a conference call with analysts that day, Lohmann stated:

> I do also feel that we have turned the corner on the
> reserve thing with this further study ... I really
> feel very strongly that [in] 2003 you are not going to
> see this sort of development impairing our good
> performance in the business year 2003, and the
> improvements that we had hoped would flow through
> fully in the bottom line of 2002 will flow through in
> 2003.

The announcement of the reserve adjustments impacted the market:

The ADSs had closed the previous trading day at $22 and dropped

more than 10%.  A similar slide was seen in the Swiss shares.

On November 19, 2002, Converium issued a press release

stating that it had "finalized" its reserve analysis and would

increase reserves by $70 million as a result.  The company said

that the reserve increase was due to "the continued emergence of

increased reported losses versus expected losses related to

prior years."  In the release, Lohman stated:

> The steps taken in the third and fourth quarter
> underlie Converium management's determination to
> confront emerging reserve issues in a forthright and
> proactive manner.  As a result, I am confident that
> the underlying earnings power of our in-force business
> will manifest itself.

Kauer added, "These additional provisions keep us at our best

estimate within our actuarial range and represents [sic]

approximately 2.8% of our reserves."  Plaintiffs allege that,

notwithstanding their public statements, the Officer Defendants

knew that Converium North America's reserve shortfall had

ballooned to hundreds of millions of dollars and that the four

reserve increases taken during 2002 were therefore woefully

inadequate.

On February 11, 2003, Converium announced its full-year

financial results for 2002, as well as the results from the

fourth quarter.  It reported net income of $107 million -- a

$474 million jump from the prior year -- and earnings per share

of $2.68.  The accompanying press release reported that the

company's "substantial improvement of underlying performance

continues" and that the 2002 results were "driven by the very

strong performance in non-life underwriting."  In the release,

Lohmann said:

> Our industry has seen considerable turmoil during 2002
> ....  Our expectation is that this trend will continue
> on into 2003.  Converium, with its strong balance
> sheet and clear positioning as a leading independent
> reinsurer, is emerging as a winner from this industry
> shakeout.

Converium's 2002 Form 20-F also addressed the reserve increases:

> In 2002, we strengthened reserves by $148.5 million. Throughout the year, increased loss experience related to prior years continued to emerge.  These additional provisions are the result of the continued emergence of increased reported losses versus expected losses related to prior years.  As a result of actuarial work performed at Converium North America through the third and fourth quarters, management concluded that ultimate losses would most likely be higher in the range of possible outcomes than previously estimated. During 2002, Converium North America engaged in an in-depth actuarial reserve analysis of certain lines of business, which resulted in an increase of $137.2 million of provisions for net losses, primarily related to underwriting years 1997 through 2000 ....

During the first half of 2003, Converium continued to announce strong financial results for its business as a whole and for Converium North America in particular.  In public statements and press releases, executives spoke positively about the company's business and did not make any mention of the Deloitte study that had revealed a $437 million reserve deficiency, or Converium North America's $340 million adverse loss development.  During a July 29 call with analysts, Kauer stated that "Converium maintains a strong reserving level.... We continue to maintain our reserving discipline."  After Converium announced its financial results from the first half of 2003, Standard & Poor's issued a press release reaffirming its "A" rating of the company.

During the second half of 2003, as Converium executives were shifting losses from Converium North America to Converium Zurich's books and eliminating the company's geographic financial reporting system, Converium's public statements continued to be upbeat.  During an October 28 call with analysts, for example, Lohmann observed that the company had experienced "continued strong overall performance" and that it carried "strong reserve levels supported by the enhanced understanding and modeling of the underlying drivers of that exposure."

When Converium announced its full-year financial results for 2003, it touted its more than 200% increase in operating income and noted that it had been able to <u>decrease</u> its reserves by more than $30 million.  In April 2004, Converium announced that its first quarter operating income was "the best Converium has thus far reported in its history."  The company also reported that it had increased its reserves by $43 million.

IV. Converium North America's Collapse

When the time came to report Converium's second quarter financial results, the massive reserve deficiency at Converium North America could no longer be hidden.[9]  Before trading opened

---

[9]  According to plaintiffs, Lohmann and Kauer attempted to keep the problems under wraps by asking executives to "bury" tens of

in New York or Switzerland on July 20, Converium issued a press release announcing that it would incur a $400 million charge in connection with an increase in Converium North America's reserves.  On a conference call later that day, Lohmann stated that the increase was triggered by events occurring in April and May 2004.  He also said that Converium did not "expect to see further reserve development" and that the company was "erring on the conservative side now."

The market reaction was dramatic: Both the Swiss share price and the American ADS price dropped by nearly 50% in a single day of trading.  The result was a $1 billion decrease in Converium's market capitalization.  J.P. Morgan stated that the $400 charge called "management credibility" into question in light of the fact that "assurances [had] repeatedly been given in the past that US casualty reserving issues [had] largely been addressed."  Similarly, Morgan Stanley called the move "bewildering[]," given that management had "repeatedly stated over the past 12 months that they did not expect to see large additions to US casualty reserves."

On August 30, Converium announced that it would be increasing reserves by an additional $50 - $100 million.  On September 2, the company stated that, because of the reserve

---

millions of dollars in reserve deficiencies.  The executives refused to do so.

increases, Standard & Poor's and A.M. Best had lowered their ratings of Converium.  The Swiss and American stock prices again dropped.  In the wake of this announcement, Converium ADSs traded at $8.86, compared to $25.02 approximately six weeks earlier.

The ratings downgrades triggered withdrawal clauses in Converium's reinsurance agreements, allowing customers to cancel their policies without penalty and reclaim previously paid premiums.  On September 10, Converium announced that Converium North America would be placed into run-off, meaning that it would effectively be out of business.  It also announced that defendant Terry G. Clarke ("Clarke"), who was serving as a member of Converium's board of directors, would become managing director -- a position in which he would be "assisted" by Lohmann.  On November 4, Kauer resigned.  Three and a half months later, Clarke replaced Lohmann as Converium's CEO.  The total amount by which Converium increased its reserves in 2004 was ultimately $562 million -- almost entirely because of the North American deficiencies.  The company's loss for 2004 was $761 million.


Procedural History

On October 4, 2004, the first purported class action complaint, captioned Meyer v. Converium Holding AG, et al., No.

19

04 Civ. 7897, was filed in the United States District Court for the Southern District of New York.  Within two months, five additional putative class actions had been filed.  These complaints brought claims under the Exchange Act against Zurich, Converium, and certain of Converium's officers and directors. None of these actions named any of the underwriters as defendants, and none brought claims under the Securities Act.

On December 9, a class action complaint captioned Rubin v. Converium Holding AG, et al., No. 04117332, was filed in New York State Supreme Court, New York County.  The Rubin complaint asserted claims under the Securities Act only.[10]  The same day, plaintiff Michael Rubin ("Rubin") entered into a tolling agreement (the "Tolling Agreement") with the Merrill Lynch and UBS[11] -- who were not defendants in his action -- under which he agreed "not to name as defendants the Underwriters in any action asserting claims arising out of the underwriting of Converium's IPO" for the duration of the agreement.  In exchange, UBS and Merrill agreed to toll the statute of limitations for "any

---

[10] The Rubin action was removed to federal court on April 15, 2005.  On May 17, Rubin moved to remand the action to state court.  On June 23, Rubin agreed to withdraw his motion to remand.  An Order confirming the withdrawal of the motion was entered on November 27, 2006.

[11] Although only UBS and Merrill were named parties in the Tolling Agreement, they signed it "on behalf of each of the other underwriters comprising the underwriting group."

individual or class claims which may be brought" against them under the Securities Act arising out of the Converium IPO.

On July 14, 2005, a stipulation was entered consolidating the six cases filed in federal court and appointing Public Employee Retirement System of Mississippi ("PERS") and Avalon Holdings, Inc. ("Avalon") as lead plaintiffs.  PERS is a public pension fund that manages assets for the benefit of current and former retired public employees of the State of Mississippi. Avalon is a private institutional investor incorporated in Nevis and based in Greece.  The lead plaintiffs bring claims on behalf of all persons and entities that acquired Converium shares or ADSs between December 11, 2001 and September 2, 2004 (the "Class Period").  Both lead plaintiffs claim to have purchased Converium securities during the Class Period at "artificially inflated prices" and to have suffered damages as a result of the decline in the value of their investments.

On September 23, 2005, plaintiffs filed an amended complaint, naming UBS and Merrill Lynch as defendants for the first time, and adding Securities Act claims against all defendants based on the allegedly false statements contained in the Prospectus and Registration Statement.  On November 11, Rubin informed the Underwriter Defendants that he was terminating the Tolling Agreement, and on December 12, he filed a purported class action complaint in New York State court

against UBS, Merrill Lynch, and the rest of the underwriters of
the Converium IPO.

On October 16, 2006, these federal actions were reassigned
to this Court, and through an Order of November 16, were
consolidated.  This Opinion addresses the pending motions to
dismiss filed by defendants on December 23, 2005.


Discussion

Under the pleading standard set forth in Rule 8(a) of the
Federal Rules of Civil Procedure, a complaint must include "a
short and plain statement of the claim showing that the pleader
is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "[A]
plaintiff is required only to give a defendant fair notice of
what the claim is and the grounds upon which it rests."
Leibowitz v. Cornell Univ., 445 F.3d 586, 591 (2d Cir. 2006).
When considering a motion to dismiss, a trial court "must accept
as true all the factual allegations in the complaint and draw
all reasonable inferences in plaintiffs' favor."  In re
Tamoxifen Citrate Antitrust Litig., 466 F.3d 187, 200 (2d Cir.
2006) (citation omitted).  It may "dismiss a complaint only if
it is clear that no relief could be granted under any set of
facts that could be proved consistent with the allegations" set
forth therein.  Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514
(2002) (citation omitted); see also Twombly v. Bell Atl. Corp.,

425 F.3d 99, 106 (2d Cir. 2005).  Although the focus should be on the pleadings, a court may also consider any written instrument attached to the complaint as an exhibit, "or any statements or documents incorporated in it by reference." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) (citation omitted); see also Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991).

Under Rule 9(b), "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  Rule 9(b) applies to securities law claims to the extent these "claims are premised on allegations of fraud."  Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004).  The Rule requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006). Under Rule 9(b) "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  Nonetheless, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." Lerner, 459 F.3d at 290 (citation omitted).  The inference

> may be established either (a) by alleging facts to
> show that defendants had both motive and opportunity
> to commit fraud, or (b) by alleging facts that

constitute strong circumstantial evidence of conscious misbehavior or recklessness.

Id. at 290-91 (citation omitted).  In securities fraud actions, the requirements of Rule 9(b) are applied "assiduiously." Lentell v. Merill Lynch & Co., 396 F.3d 161, 168 (2d Cir 2005).

The PSLRA imposes additional requirements on plaintiffs. Any "securities fraud" claims brought under the Exchange Act must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed."  15 U.S.C. § 78(u)-4(b)(1).  See Rombach, 355 F.3d at 170.  "[N]o claim should be filed unless and until it can be supported by specific factual allegations."  Lentell, 396 F.3d at 168.

"The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b-5, that the plaintiff must allege is an intent to deceive, manipulate or defraud." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (citation omitted). In the Second Circuit, plaintiffs alleging securities fraud have long been required to state with particularity "facts that give rise to a strong inference of fraudulent intent." Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995); see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris

Cos., 75 F.3d 801, 812 (2d Cir. 1996).  The PSLRA did not alter the level of pleading previously required by the Second Circuit, Kalnit, 264 F.3d at 138, but it raised the nationwide pleading standard for securities fraud:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2).


I. Exchange Act Claims

Plaintiffs bring claims under Section 10(b) of the Exchange Act against ZFS, Converium, and the Officer Defendants, and Section 20(a) "controlling person" claims against Zurich, the Officer Defendants, and members of Converium's board of directors.[12]  Section 10(b) creates civil liability for those who

> use or employ, in connection with the purchase or sale of any security ··· any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  The section prohibits

---

[12] Collectively, Clarke, Peter C. Colombo, George F. Mehl, Jurgen Forterer, Anton K. Schnyder, Derrell J. Hendrix, George G.C. Parker are referred to as the "Director Defendants."  The Section 20(a) claim is brought against all of the Director Defendants except Clarke.

> conduct involving manipulation or deception,
> manipulation being practices that are intended to
> mislead investors by artificially affecting market
> activity, and deception being misrepresentation, or
> nondisclosure intended to deceive.

Ganino v. Citizens Utilities Co., 228 F.3d 154, 161 (2d Cir. 2000) (citation omitted).

To establish liability under Section 10(b), a plaintiff must prove that a defendant, "acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device" in connection with the purchase or sale of a security. S.E.C. v. First Jersey Secs., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996). Scienter "means intent to deceive, manipulate, or defraud, or at least knowing misconduct." Id. (citation omitted). Section 20(a) extends Exchange Act liability to "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78t(a).

Rule 10b-5, promulgated by the SEC under the authority of Section 10(b), imposes liability on those who "employ any device, scheme, or artifice to defraud"; "make any untrue statement of a material fact or [ ] omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"; or "engage in any act, practice, or course of

26

business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.


A. Section 10(b) Primary Liability in Connection with the IPO

1. ZFS

ZFS argues that plaintiffs' Section 10(b) claim is unsustainable because the amended complaint does not allege that ZFS made any material misrepresentations, or that any such statements were attributed to it.  In Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177 (1994), the Supreme Court held that the Exchange Act did not authorize claims for aiding and abetting Section 10(b) violations.[13]  The Court concluded that Section 10(b) did not proscribe "giving aid to a person who commits a manipulative or deceptive act."  Id.

Since Central Bank, the Second Circuit has explored its implications for Section 10(b) liability on several occasions.[14]  In Shapiro v. Cantor, 123 F.3d 717 (2d Cir. 1997), the court held that

---

[13] The prohibition on aiding and abetting causes of action no longer applies to the SEC.  See 15 U.S.C. § 78t(e); S.E.C. v. U.S. Envtl., Inc., 155 F.3d 107, 113 (2d Cir. 1998).

[14] An extended discussion of the circuit's relevant decisions can be found in this Court's Opinion in S.E.C. v. KPMG LLP, 412 F. Supp. 2d 349, 372-75 (S.D.N.Y. 2006).

> [i]f <u>Central Bank</u> is to have any real meaning, a
> defendant must <u>actually make a false or misleading
> statement</u> in order to be held liable under Section
> 10(b).  Anything short of such conduct is merely
> aiding and abetting, and no matter how substantial
> that aid may be, it is not enough to trigger liability
> under Section 10(b)....  Allegations of "assisting,"
> "participating in," "complicity in" and similar
> synonyms used throughout the complaint all fall within
> the prohibitive bar of <u>Central Bank</u>.

<u>Id.</u> at 720 (emphasis supplied) (citation omitted).  Soon after

<u>Shapiro</u>, the circuit held that a plaintiff must not only show

that a defendant made a false statement, but that the statement

was publicly attributed to the defendant:

> [A] secondary actor cannot incur primary liability
> under the [Exchange] Act for a statement not
> attributed to that actor at the time of its
> dissemination.  Such a holding would circumvent the
> reliance requirements of the Act, as reliance only on
> representations made by others cannot itself form the
> basis of liability.  Thus, the misrepresentation must
> be attributed to that specific actor at the time of
> public dissemination, that is, in advance of the
> investment decision.

<u>Wright v. Ernst & Young LLP</u>, 152 F.3d 169, 175 (2d Cir. 1998)

(citation omitted).

Here, plaintiffs' allegations about ZFS's involvement in

the misstatements are few and far between.  Plaintiffs claim

that: (1) Converium was a wholly owned subsidiary of ZFS at the

time of the IPO; (2) ZFS participated in the preparation of the

Prospectus; and (3) ZFS, acting "jointly" with Converium, issued

a press release in which the IPO was announced and statements

were made about Converium's loss reserves and business

prospects.  These allegations are insufficient to establish
liability for ZFS under Section 10(b).

Neither ZFS's ownership of Converium nor its participation
in the preparation of the offering documents could be construed
to be public statements to which liability attaches.  And
although a press release _would_ likely fall into that category,
the release identified by plaintiffs contains no indication that
it came from ZFS.  To the contrary, the release at issue appears
on Converium letterhead.[15]

Instead, plaintiffs rely heavily on the Second Circuit's
opinion in In re Scholastic Corp. Sec. Litig., 252 F.3d 63 (2d
Cir. 2001).  There, Section 10(b) liability was held to have
been sufficiently alleged against a company's vice president of
finance and investor relations.  Id. at 75-76.  Although the
executive argued that the misleading statements had not been
attributed to him, the court rejected that argument and found
later in its decision that plaintiffs' allegations supported the
conclusion that he "was primarily responsible for Scholastic's
communications with investors and industry analysts" and that he
"was involved in the drafting, producing, reviewing and/or
disseminating of the false and misleading statements issued by

---

[15] On the same date, ZFS issued a separate release regarding the
IPO under its own name, and plaintiffs have made no allegations
regarding the contents of that release.

Scholastic." Id.[16]  Plaintiffs read Scholastic and two recent
decisions from this Court -- In re Global Crossing, Ltd. Sec.
Ltg., 322 F. Supp. 2d 319 (S.D.N.Y. 2004); and In re LaBranche
Sec. Litig., 405 F. Supp. 2d 333 (S.D.N.Y. 2005) -- to stand for
the principle that a defendant can be held liable under Section
10(b) when he is so identified with a misleading statement that
investors would reasonably attribute it to him, despite the fact
that it was made by someone else.  ZFS questions whether these
cases can be reconciled with Wright's bright-line rule.

It is not necessary, however, to reach that issue, since
plaintiffs have not pled facts that would meet even this
"relax[ed]" version of the Wright standard.  Global Crossing,
322 F. Supp. 2d at 331.  In each of the above-cited cases, the
plaintiffs did not merely claim that defendants were generally
involved in misstatements; rather, they alleged facts that, if
true, would show that investors almost certainly understood the
defendants to be the speakers.  In Scholastic, for instance, the
court noted that the defendant was "primarily responsible" for
communicating with investors and had participated in at least
one of the calls on which misleading statements were
disseminated.  Scholastic, 252 F.3d at 70, 76.  Likewise, in
Global Crossing, the court found that investors could "easily"

---

[16] The discussion of the defendant's role occurred in the course
of addressing the complaint's allegations of scienter.
Scholastic, 252 F.3d at 76.

have understood that an accountant who publicly certified a
company's financial statements was involved in "making any
public financial reports, even where a particular statement was
not publicly attributed to it." Global Crossing, 322 F. Supp.
2d at 334.  Finally, in LaBranche, the court concluded that when
a parent company reports financial information that investors
understand "could have been provided only" by its subsidiary,
the subsidiary can be deemed to be the speaker.  LaBranche, 405
F. Supp. 2d at 351 (emphasis supplied).

Here, by contrast, plaintiffs' allegations do not provide a
basis for concluding that investors understood the statements at
issue to have been made by ZFS.  The fact that ZFS owned
Converium during the relevant period and, in some general sense,
"participat[ed]" in the preparation of offering documents does
not demonstrate the level of public involvement in the
misstatements necessary for ZFS to incur Section 10(b)
liability.  Moreover, as noted above, the press release
identified by plaintiffs appears to have come from Converium
alone.  Whether or not ZFS was actually involved in its
preparation is of no moment, since the relevant inquiry is
whether investors understood ZFS to be speaking through the
release.  Plaintiffs having not met the burden of pleading that
ZFS is subject to Section 10(b) liability, that claim against
ZFS will be dismissed.

2. Converium and the Officer Defendants

Converium and the Officer Defendants make many separate arguments directed at that portion of the Section 10(b) claim against them that is premised on false statements made at the time of and in connection with the IPO.  It is only necessary to address one of them.  The plaintiffs have failed to allege adequately their reliance on the statements in the Prospectus and Registration Statement.

The amended complaint pleads reliance by asserting that the plaintiffs and class members are "entitled to the presumption of reliance established by the fraud-on-the-market doctrine."  It then proceeds to list six reasons why the markets for Converium securities were efficient markets, including the high average daily trading volume for Converium ADSs on the New York Stock Exchange "throughout the Class Period" and the fact that the market price on the Exchange for the Converium securities traded in tandem with and reflected the effect of news disseminated in the market.  These allegations address the basis for a presumption of reliance after the IPO, but do not constitute adequate allegations of reliance for plaintiffs (or class members) at the stage of the initial public offering.

Just weeks ago, the Court of Appeals for the Second Circuit held as a matter of law that "the market for IPO shares is not

efficient." <u>In re Initial Public Offering Litig.</u>, No. 05-3349-cv, 2006 WL 3499937, at *16 (2d Cir. Dec. 5, 2006).  As a result, the court refused to accept the fraud on the market presumption in the context of securities law claims based on trading in IPO shares, and found that issues of an individual investor's reliance would predominate over the common questions in a class action.  <u>Id</u>.  In so holding, the court relied on, <u>inter alia</u>, <u>Freeman v. Laventhol & Horwath</u>, 915 F.2d 193 (6th Cir. 1990), which reviewed in detail the theoretical underpinnings for the fraud on the market presumption in a well-developed secondary market.  <u>Id</u>. at 199.  <u>Freeman</u> also explained why a primary market for newly issued securities, in which "the price of newly issued securities is set primarily by the underwriter and the offeror, not by the market," cannot benefit from that presumption.  <u>Id</u>.

The decision in <u>IPO</u> cannot be cabined, as the plaintiffs suggest, by the specific facts in <u>IPO</u> or its procedural posture.[17]  The ruling in <u>IPO</u> that the market for IPO shares "is not efficient" was independent of the opinion's separate discussion of the specific facts at issue in that case.  <u>IPO</u>, 2006 WL 3499937, at *16.  Moreover, as its citation to <u>Freeman</u> confirms, the ruling was intended to be a broad one.

---

[17] The parties have supplemented their motion papers to address <u>IPO</u>.

The plaintiffs argue that there are many reasons why a presumption of reliance should be applied to the Converium IPO. It is unnecessary to decide whether there are any facts, which if properly pleaded in a complaint, would be sufficient to allege the existence of an efficient market for an initial public offering and to support a presumption of reliance.  What is clear is that the allegations of reliance in the amended complaint that is the subject of this motion are insufficient even when judged under the lenient Rule 8 standard.  The amended complaint relies on a presumption of reliance based on the trading in the secondary market for Converium securities, and does not allege at any point that an individual plaintiff actually relied on the IPO prospectus or that the IPO market was efficient.  To the extent plaintiffs' Exchange Act claims are based on statements made in connection with the IPO, they will be dismissed.

B. Section 10(b) Primary Liability for Post-IPO Statements

Converium and the Officer Defendants move to dismiss the Section 10(b) claim against them on the grounds that the complaint fails to allege that they made any material misrepresentation or omission with scienter.  This argument may be swiftly rejected.

A strong inference of scienter exists when there are allegations that a defendant "knew facts or had access to information suggesting that [the company's] public statements were not accurate." Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000). The amended complaint alleges in sufficient detail to survive the motions to dismiss that Converium's public announcements and filings contained misrepresentations regarding both the adequacy of its loss reserve and its financial results, that Converium and the Officer Defendants understood that the publicly reported numbers were at odds with Converium's internal analyses, and that those same defendants believed that the internal analyses more accurately reflected the actual financial condition of the company.

In their motions to dismiss the Section 10(b) claim, Converium and the Officer Defendants emphasize Converium's use of outside consultants, including most notably Tillinghast, and argue that the reports prepared by those consultants gave the defendants an independent basis for a good faith belief that the publicly reported numbers were accurate. At this stage of the litigation, a court may not "weigh the evidence that might be presented at trial." Chosun Int'l, Inc. v. Chrisha Creations, Ltd., 413 F.3d 324, 327 (2d Cir. 2005) (citation omitted). Its task instead is simply "to determine whether the complaint itself is legally sufficient." Id. (citation omitted).

Moreover, the plaintiffs are entitled to have all reasonable inferences drawn in their favor.  <u>Tamoxifen</u>, 466 F.3d at 200. As a result, even when the consultants' reports are considered, the plaintiffs have still made sufficient allegations to support a strong inference of scienter under the heightened pleading standards of Rule 9(b) and the PSLRA.[18]

C. Section 20(a) "Controlling Person" Liability

ZFS and the Officer and Director Defendants argue that the Section 20(a) claims against them are insufficiently pled. There are two components to such a claim: "(1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant."  <u>In re WorldCom, Inc. Sec. Litig.</u>, 294 F. Supp. 2d 392, 414 (S.D.N.Y. 2003).  As discussed above, plaintiffs have not alleged a primary violation by Converium in connection with the IPO. Because the amended complaint does not allege that ZFS or the Director Defendants continued to be controlling persons <u>after</u>

---

[18] The plaintiffs have moved to strike the final Tillinghast report and several other documents on which the defendants have relied in bringing their motions to dismiss.  Since Converium and the Officer Defendants' motion to dismiss the Section 10(b) claim must be denied even when the defendants' documents are considered, it is unnecessary to reach the question of whether it is proper to consider documents that were not identified in the complaint.  The plaintiffs' motion to strike is therefore denied as moot.

the IPO, the Section 20(a) claims against them will be dismissed.

The claim against the Officer Defendants will, however, go forward.  As this Court has previously observed, to survive a motion to dismiss a Section 20(a) claim, a plaintiff need not make detailed allegations:

> At the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard.  At trial, the degree of control will require the plaintiff to present prima facie evidence of sufficient control to support liability....  If the plaintiff has adequately pleaded a Section 10(b) claim, the first or primary violation element of a Section 20(a) claim is sufficiently pled.  Control is defined in 17 C.F.R. § 240.12b-2 as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  A short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required.

Id. at 415-16 (citation omitted).

Plaintiffs have clearly met their burden with respect to the Officer Defendants.  Plaintiffs allege that, "[b]y reason of their status as officers and members of the Executive Committee of Converium during the class period," the Officer Defendants "control[led] the conduct of Converium's business, the establishment of its loss reserves, the novation of its contracts, the information contained in its filings with the SEC, and public statements about its business."

II. Securities Act Claims

Plaintiffs bring claims under Section 11 of the Securities Act against all defendants other than ZFS.  It also brings Section 12(a)(2) claims against ZFS, Converium, and the Underwriter Defendants, and Section 15 "controlling person" claims against Zurich, the Officer Defendants, and the all of the Director Defendants other than Clarke.

Section 11 provides that any signer, director of the issuer, preparing or certifying accountant, or underwriter may be liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading...."  15 U.S.C. § 77k(a).  The purpose of the section was "to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983). Section 12(a)(2) of the Securities Act allows a purchaser of a security to bring a private action against a seller that "offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to

make the statements ... not misleading." 15 U.S.C. § 77l(a)(2).
Section 15 extends Securities Act liability to "[e]very person
who, by or through stock ownership, agency, or otherwise ...
controls any person liable under [Section 11] or [Section 12] of
this title." 15 U.S.C. § 77o.

The statute of limitations for these claims is set forth in
Section 13 of the Securities Act. It provides:

> No action shall be maintained to enforce any liability
> created under section 77k [Section 11] or 77 l(a)(2)
> [Section 12(a)(2)] of this title unless brought within
> one year after the discovery of the untrue statement
> or the omission, or after such discovery should have
> been made by the exercise of reasonable diligence....
> In no event shall any such action be brought to
> enforce a liability created under section 77k or 77
> l(a)(2) of this title more than three years after the
> security was bona fide offered to the public, or under
> section 77 l(a)(2) of this title more than three years
> after the sale.

15 U.S.C. § 77m.  Here, defendants invoke the one-year
limitations period, arguing that plaintiffs were on constructive
notice of any problems with the company's loss reserving
practices no later than November 17, 2002.

The one-year limitations period for federal securities
fraud claims begins to run after the plaintiff "obtains actual
knowledge of the facts giving rise to the action or notice of
the facts, which in the exercise of reasonable diligence, would
have led to actual knowledge." Shah v. Meeker, 435 F.3d 244,
249 (2d Cir. 2006) (citation omitted).  In many instances,

inquiry notice is provided by "company-specific information

probative of fraud," often called "storm warnings." <u>Lentell</u>,

396 F.3d at 169.  Such information

> gives rise to a duty of inquiry when the circumstances
> would suggest to the person of ordinary intelligence
> the probability that she has been defrauded.  In such
> circumstances, the imputation of knowledge will be
> timed in one of two ways: (i) if the investor makes no
> inquiry once the duty arises, knowledge will be
> imputed as of the date the duty arose; and (ii) if
> some inquiry is made, we will impute knowledge of what
> an investor in the exercise of reasonable diligence
> should have discovered concerning the fraud, and in
> such cases the limitations period begins to run from
> the date such inquiry should have revealed the fraud.

<u>Id.</u> at 168 (citation omitted).

For financial information to trigger a duty to inquire, it

must "relate[] directly to the misrepresentations and omissions

the Plaintiffs later allege in their action against the

defendants." <u>Newman v. Warnaco Group, Inc.</u>, 335 F.3d 187, 193

(2d Cir. 2003) (citation omitted).  Additionally, storm warnings

exist only when the available information makes fraud or

wrongdoing "probable, not merely possible." <u>Shah</u>, 435 F.3d at

249 (citation omitted).

In some cases, despite the presence of storm warnings,

investors are not placed on inquiry notice "because the warning

signs are accompanied by reliable words of comfort from

management." <u>LC Capital Partners, LP v. Frontier Ins. Group,</u>

<u>Inc.</u>, 318 F.3d 148, 155 (2d Cir. 2003).  While such statements

40

must be considered, their existence will prevent or dissipate
the duty to inquire "only if an investor of ordinary
intelligence would reasonably rely on the statements to allay
the investor's concern." Id. This inquiry depends "in large
part on how significant the company's disclosed problems are,
how likely they are of a recurring nature, and how substantial
are the 'reassuring' steps announced to avoid their recurrence."
Id.

Whether a plaintiff was placed on inquiry notice "is often
inappropriate for resolution on a motion to dismiss" but, if the
facts needed to make the determination "can be gleaned from the
complaint and papers integral to the complaint," resolution of
the issue on a motion to dismiss is appropriate. Lentell, 396
F.3d at 168 (citation omitted). Indeed, the Second Circuit has
resolved the question of inquiry notice on a motion to dismiss
"in a vast number of cases." Id. (citation omitted).

One such case presented facts strikingly similar to those
at issue in this action and governs the outcome here. In LC
Capital, investors sued an insurance company and its accounting
firm, alleging that defendants undermined the financial health
of the company by deliberately and systematically under-
reserving for claims. LC Capital, 318 F.3d at 150. The Second
Circuit held that plaintiffs' securities fraud claims were time-
barred because storm warnings were evident more than a year

41

prior to the filing of the complaint.  Id. at 155.  The primary
warnings identified by the court were the three reserve charges
taken by the insurer within four years -- $17.5 million in 1994;
$40 million in 1997; and $139 million in 1998.  Id.  The circuit
noted:

> Many companies take one-time charges to reflect
> unanticipated developments without creating any
> suspicion of impropriety, but a series of three
> charges in substantial and increasing amounts for the
> same purpose within four years should alert any
> reasonable investor that something is seriously wrong.

Id.

Here, Converium -- and, in particular, its North American
business unit -- booked a larger number of reserve-related
charges over an even shorter period of time.  In 2002 alone,
Converium saw reserve increases of $11.6 million, $24.4 million,
$59.6 million, and $70.3 million.  Taking Converium North
America in isolation yields still higher figures: $39.9 million,
$19.9 million, $47 million, and $70.3 million over the same
period.  These adjustments "relate[] directly to the
misrepresentations and omissions" alleged in the amended
complaint, Newman, 335 F.3d at 193, and together amount to
approximately three quarters of the reserve deficiency that
plaintiffs claim Converium was carrying as of the time of its
IPO.

Plaintiffs' attempt to distinguish LC Capital is
unconvincing.  They argue that, even as it was making reserve
adjustments, Converium's management was reassuring investors
that the company's business remained strong and that its
problems had been addressed.  They also note that these
statements were followed by "record earnings over the course of
two years and even a decrease of loss reserves."  In LC Capital,
by contrast, management's reassurances were followed by
announcements of losses.  LC Capital, 318 F.3d at 151-52.
According to plaintiffs, the LC Capital investors were therefore
on notice of the company's issues, while Converium investors
were not.

That is not, however, the holding of LC Capital.  In
explaining why investors were not entitled to rely on
management's reassurances in that case, the circuit made no
mention of the company's profitability:

> Under-reserving is obviously a serious problem for an
> insurance company.  The prospect that the problem
> would recur was heightened when three substantial
> reserve charges were taken within four years,
> indicating the likelihood of either a fundamental
> defect in the company's reserve methodology or the
> company's refusal to face reality.  The "reassuring"
> statements by management were mere expressions of
> hope, devoid of any specific steps taken to avoid
> under-reserving in the future.  In these
> circumstances, the claimed reassurances are
> unavailing.

43

LC Capital, 318 F.3d at 155-56.  The issue therefore is not
whether the reserve adjustments made Converium unprofitable, but
whether they put investors on notice that the company was likely
to have ongoing problems with reserving.[19]  As noted above,
Converium's charges were both large and frequent enough to do
so.[20]  As a result, plaintiffs were on notice of Converium's
alleged under-reserving practices no later than November 17,
2002 -- the date on which the company announced its fourth
reserve increase within a year.  All claims under the Securities
Act -- whether for primary or "controlling person" liability --
therefore expired far before the first complaint in the
consolidated actions was filed on October 4, 2004.[21]  The
Securities Act claims will be dismissed.

_____

[19] Plaintiffs have not argued that the statements made by
Converium executives were substantively different from those
made by company management in LC Capital.  In fact, many of the
statements of the two companies were nearly identical.

[20]  When Converium announced the third of its four reserve
adjustments, Standard & Poor's and Moody's both downgraded the
company, with a Standard & Poor's analyst noting that the move
made it clear that "long-tail exposures" -- or claims submitted
long after the date on which the policies covering those losses
had been written -- on American contracts posed ongoing problems
for the company and the industry:
> [C]oming relatively soon after a full actuarial review
> of Converium's business as [sic] at year-end 2000, the
> adverse development also underlines the continuing
> difficulty for insurers and reinsurers and their
> advisers in accurately reserving for prior year U.S.
> long-tail exposures.

[21] Because the claims expired prior to the signing of the Rubin
Tolling Agreement, it is not necessary to reach the issue of

Conclusion

For the foregoing reasons, defendants' motions to dismiss are granted with respect to: (1) all claims against ZFS, the Underwriter Defendants, and the Director Defendants; and (2) the Exchange Act claims against Converium and the Officer Defendants to the extent they are based on statements made in connection with the IPO.  The motion to dismiss the Exchange Act claims against Converium and the Officer Defendants is otherwise denied.


SO ORDERED:

Dated:    New York, New York
          December 28, 2006

                              _____
                                   DENISE COTE
                              United States District Judge

---

whether plaintiffs in the consolidated federal actions may benefit from its terms.