UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
IN RE SCOR HOLDING (SWITZERLAND) AG     :          MASTER FILE
LITIGATION                              :      04 Civ. 7897 (DLC)
                                        :
This Document Relates to:               :      OPINION AND ORDER
                                        :
ALL ACTIONS                             :
                                        :
----------------------------------------X

Appearances:

For Plaintiffs:
John P. Coffey
Steven B. Singer
Beata Gocyk-Farber
Avi Josefson
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019

Robert M. Roseman
Andrew D. Abramowitz
Daniel Mirarchi
Rachel E. Kopp
Spector Roseman & Kodroff, P.C.
1818 Market Street
Suite 2500
Philadelphia, PA 19103

Mark S. Willis
Avi Garbow
Elizabeth S. Finberg
Matthew K. Handley
Cohen Milstein Hausfield & Toll, P.L.L.C.
1100 New York Avenue N.W.
Suite 500, West Tower
Washington, D.C. 20005

For Defendants SCOR Holding (Switzerland) AG (f/k/a Converium
Holding AG), Dirk Lohmann and Martin Kauer:
Stephen W. Greiner
Richard Mancino
Jeanne M. Luboja
Mary Eaton
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019

For Defendant Richard Smith:
Thorn Rosenthal
Cahill Gordon & Reindell LLP
80 Pine Street
New York, NY 10005

DENISE COTE, District Judge:

This Opinion partially grants a motion to certify a class
in an action brought under the federal securities laws.  It
denies the motion to the extent it seeks to include foreign
investors who purchased shares on a foreign exchange and to
begin the class period during the "quiet period" that followed
the initial public offering of the stock at issue.

Lead Plaintiffs in this putative securities class action,
Public Employees' Retirement System of Mississippi ("PERSM") and
Avalon Holdings, Inc. ("Avalon"), asserted claims under the
Securities Act of 1933 ("Securities Act") and the Securities
Exchange Act of 1934 (the "Exchange Act") against Converium
Holding AG ("Converium") (now known as SCOR Holding
(Switzerland) AG, or "SCOR"), certain of its officers and
directors, its former parent company, Zurich Financial Services

("ZFS"), as well as Securities Act claims against the lead underwriters of Converium's initial public offering in December of 2001 (the "IPO").  These defendants filed motions to dismiss, and in an Opinion dated December 28, 2006, all claims against ZFS, the underwriters, and the former Converium directors were dismissed.  In re Converium Holding AG Sec. Litig., No. 04 Civ. 7897 (DLC), 2006 WL 3804619 (S.D.N.Y. Dec. 28, 2006) (the "December 2006 Opinion").  The December 2006 Opinion also dismissed the Exchange Act claims against Converium and its former officers (Drik Lohmann, Martin Kauer, and Richard Smith, collectively, the "Officer Defendants," and together with Converium/SCOR, the "Defendants") that were based on alleged misrepresentations made in connection with the Converium IPO. Following a motion for reconsideration filed by the Lead Plaintiffs, however, see In re Converium Holding AG Sec. Litig., No. 04 Civ. 7897 (DLC), 2007 WL 1041480 (S.D.N.Y. Apr. 9, 2007) (granting the motion in part), an Opinion dated September 14, 2007, denied the motions to dismiss those claims to the extent that they were brought on behalf of those who purchased in the "aftermarket" following the IPO, rather than directly in the IPO itself.  In re Converium Holding AG Sec. Litig., No. 04 Civ. 7897 (DLC), 2007 WL 2684069, at *2-4 (Sept. 14, 2007).  Lead Plaintiffs now move for class certification.  For the reasons stated below, that motion is granted in part.

BACKGROUND

The relevant facts were reviewed in detail in the December 2006 Opinion, but they can be briefly summarized here. Prior to the IPO, Converium was a wholly owned subsidiary of ZFS. Converium (now known as SCOR) was a multinational reinsurer organized under the laws of Switzerland, with offices in, <u>inter alia</u>, Switzerland, New York, and Germany. This action was filed following the collapse of Converium's largest business unit, Converium North America, in September 2004. Lead Plaintiffs allege, in brief, that between the time leading up to the Converium IPO in late 2001 and some time between July and September 2004, the Defendants grossly misrepresented the sufficiency of Converium North America's loss reserves, primarily for policies written by ZFS in North America between 1996 and 2000. Lead Plaintiffs allege that the Defendants in various press releases, SEC filings, and analyst conference calls concealed the fact that those reserves were hundreds of millions of dollars less than they needed to be to cover Converium's exposure to claims made by ceding insurers.[1]  Because

---

[1] As explained in the December 2006 Opinion,

> As a multinational reinsurer, Converium's business is, in basic terms, to provide insurance to other insurers. Converium collects premiums in exchange for exposure to claims made by the insured companies, or "ceding insurers." It sets aside a portion of these premiums as "loss reserves," which represent the amount the company estimates it will have to pay to

loss reserves are booked as liabilities on a reinsurer's balance
sheet, as a result of these alleged misrepresentations Converium
North America's -- and thus Converium's -- financial position
was presented to the public as being far stronger than it
actually was during the relevant period.  The sole remaining
claims in this action are claims against the Defendants under
Sections 10(b) and 20(a) of the Exchange Act based upon these
alleged misrepresentations.


DISCUSSION

        Pursuant to Rules 23(a) and 23(b)(3), Fed. R. Civ. P., Lead
Plaintiffs request certification of a class encompassing all
those who purchased Converium stock between December 11, 2001,
the date of the Converium IPO, and September 2, 2004, either on
the SWX Swiss Exchange ("SWX") or in the form of American
Depository Shares ("ADSs") on the New York Stock Exchange
("NYSE").[2]  In opposition, Defendants argue (1) that this Court

_____

          cover the ceding insurers' claims under the policies
          that have been written to date.  Loss reserves for a
          given policy are established when the contract is
          signed, and later revised as claims are submitted and
          more detailed information becomes available about the
          likely amount the reinsurer will have to pay under the
          policy.  Loss reserves are the largest expense item on
          Converium's income statement.
December 2006 Opinion, at *1.

[2] Each ADS represented one-half of one registered share of
Converium common stock.

lacks subject matter jurisdiction over the claims of foreigners who purchased Converium shares on the SWX; (2) that the class cannot include any person who purchased Converium stock before January 7, 2002, because the market for Converium shares was not efficient before that time; (3) that the class cannot include any person who purchased Converium stock after November 19, 2002 or, in any event, July 20, 2004, because the public was on notice of Converium North America's loss reserve problems as of those dates; and (4) that the class action mechanism is not a superior method for resolving the claims of foreign purchasers in light of the potential difficulties presented both by giving notice of the class action to those purchasers and by any attempt to enforce a judgment reached in an opt-out class action in the countries in which those shareholders reside.

Each of these arguments will be addresses as necessary below. Notably, however, Defendants do not offer argument in opposition to Lead Plaintiffs' motion insofar as the motion seeks certification of a class comprising United States residents who purchased Converium shares on the SWX, or any person who purchased Converium ADSs on the NYSE, between January 7 and November 19, 2002.

I.  Subject Matter Jurisdiction Over Foreign Purchasers on the
    SWX

Defendants' initial contention is that this Court does not

have subject matter jurisdiction over the claims of foreign

persons who purchased Converium shares on the SWX.[3]  (For ease of

reference, such potential class members will be referred to as

"Foreign Plaintiffs.")  Lead Plaintiff Avalon, an institutional

investor incorporated in Nevis and based in Athens, Greece, is a

member of this category of plaintiffs.  For the reasons stated

below, the Lead Plaintiffs have failed to meet their burden of

demonstrating that this Court possesses subject matter

jurisdiction over the claims of the Foreign Plaintiffs, and

therefore the Foreign Plaintiffs will not be included in the

class certified by this Opinion, and their claims will be

dismissed.  As a consequence, the sole Lead Plaintiff will be

PERSM.

A plaintiff bears the burden of proving by a preponderance

of the evidence that subject matter jurisdiction exists.  McNutt

v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936);

Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638

(2d Cir. 2005).  Jurisdictional allegations must be shown

_____

[3] It has not been suggested that this Court lacks subject matter
jurisdiction over the claims of U.S. residents who purchased
Converium shares on the SWX, or over the claims of any person
who purchased Converium ADSs on the NYSE.  As discussed below,
this Court does indeed possess such jurisdiction.

affirmatively, and may not be inferred favorably to the party asserting jurisdiction.  APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003).  In resolving factual challenges to subject matter jurisdiction, a court may consider evidence outside of the pleadings.  United States v. Space Hunters, Inc., 429 F.3d 416, 425-26 (2d Cir. 2005).

Federal district courts are courts of limited jurisdiction. They have been granted jurisdiction over, inter alia, civil actions that arise under the laws and Constitution of the United States, that is, jurisdiction over federal-question cases. Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 560 (2005).  The existence of federal jurisdiction is assessed "claim by claim," and plaintiff by plaintiff.  Id. at 554. Where federal-question jurisdiction exists for a claim brought by a single plaintiff, it is not destroyed because claims brought by another plaintiff in the same action are jurisdictionally defective.  Id. at 561-62, 566.  The remedy in such circumstances is to dismiss the plaintiff bringing defective claims.  Id. at 561.

The Exchange Act extends a private civil remedy for money damages to purchasers and sellers of securities.  Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 80-81 (2006); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731-32 (1975).  Where such an action is brought on behalf of

both domestic and foreign purchasers, a separate evaluation of the existence of subject matter jurisdiction for each plaintiff -- or, in a class action, each category of plaintiffs -- must be made. Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 974, 993 (2d Cir. 1975). Where the claims of the foreign purchasers are jurisdictionally defective, they are dismissed from the case. Id. at 997.

Because the federal securities laws themselves are largely silent as to their extraterritorial reach, S.E.C. v. Berger, 322 F.3d 187, 192 (2d Cir. 2003), "[w]hen . . . a court is confronted with transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have wished the precious resources of United States courts . . . to be devoted to them rather than leave the problem to foreign countries." Bersch, 519 F.2d at 985. Guided by this basic principle, the Court of Appeals has counseled that in order to determine whether a court may assert subject matter jurisdiction over alleged violations of the securities laws arising out of "predominately foreign" securities transactions, a court should consider two tests: "(1) whether the wrongful conduct occurred in the United States," commonly referred to as the "conduct test," and "(2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens,"

commonly referred to as the "effects test." Berger, 322 F.3d at 192 (citation omitted).

Assuming that the purchase of Converium ADSs on the NYSE and the purchase of Converium shares by U.S. residents[4] on the SWX may be viewed as predominantly foreign securities transactions, it is not contested here that this Court has subject matter jurisdiction over claims arising out of such transactions under the effects test without consideration of the conduct test. According to analysis conducted by Lead Plaintiffs' expert, Dr. Scott D. Hakala ("Hakala"), the number of Converium shares not held by Converium officers ranged between 35 million at the time of the IPO and 40 million later in the proposed class period. Hakala's report states that between 14% and 29% of those shares were owned by U.S. institutional investors during the proposed class period, and between 7% and 11% of Converium shares traded on the NYSE in the form of ADSs during that time.[5] Given such broad U.S. holdings, it must be concluded at this stage that the alleged fraud, even if it occurred entirely outside the United States, would have

---

[4] Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London ("EOC"), 147 F.3d 118, 128 n.12 (2d Cir. 1998) ("U.S. residence of individual investors -- not American nationality -- must be the focus of the effects test.").

[5] These figures do not appear to include shares held by non-institutional investors in the United States.

had a "substantial effect in the United States or upon United States citizens." <u>Id.</u> (citation omitted).[6]

Whether this Court has subject matter jurisdiction over the Exchange Act claims brought by the Foreign Plaintiffs, however, is a distinct question requiring separate analysis. That the transactions giving rise to the claims of the Foreign Plaintiffs -- their purchases of Converium securities on the SWX -- must be considered predominantly foreign is not disputed, and thus the need to apply the conduct and effects tests is likewise beyond dispute. <u>Id.</u> (citation omitted). Before proceeding further with the analysis, however, two points merit clarification.

First, the Court of Appeals has counseled that "[t]here is no requirement that these two tests be applied separately and distinctly from each other," and, in fact, "an admixture or combination of the two often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court." <u>Itoba Ltd. v. LEP Group PLC</u>, 54 F.3d 118, 122 (2d Cir. 1995). Second, it must

---

[6]  The required effect on United States investors can be found even when there are only a "relatively small number" of American investors. <u>Consol. Gold Fields PLC, v. Minorco, S.A.</u>, 871 F.2d 252, 262 (2d Cir. 1989). As the Court of Appeals observed in <u>Consolidated Gold Fields</u>, if it had already found in <u>Bersch</u> "that Congress intended American anti-fraud laws to apply to a transaction involving 41,936 shares owned by 22 American residents, then surely we must come to the same conclusion . . . where American residents representing 2.5% of Gold Field's shareholders owned 5.3 million shares with a market value of about $120 million." <u>Consol. Gold Fields</u>, 871 F.2d at 262.

nevertheless be recognized that consideration of the effects test alongside the conduct test is unlikely to provide any additional benefit to foreign plaintiffs in a class action lawsuit who purchased a foreign company's stock on a foreign exchange.  See, e.g., In re Rhodia S.A. Sec. Litig., No. 05 Civ. 5389 (DAB), 2007 WL 2826651, at *8 (S.D.N.Y. Sept. 26, 2007); In re Nat'l Australia Bank Sec. Litig., No. 03 Civ. 6537 (BSJ), 2006 WL 3844465, at *3-4 (S.D.N.Y. Oct. 25, 2006); In re Alstom S.A. Sec. Litig., 406 F. Supp. 2d 346, 368-70 (S.D.N.Y. 2005); In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 511 (S.D.N.Y. 2005); In re Bayer AG Sec. Litig., 423 F. Supp. 2d 105, 114 (S.D.N.Y. 2005).

The effects test was developed "in order to protect domestic investors who have purchased foreign securities on American exchanges and to protect the domestic securities market from the effects of improper foreign transactions in American securities," Schoenbaum v. Firstbrook, 405 F.2d 200, 206 (2d Cir.), rev'd in part on other grounds, 405 F.2d 215 (2d Cir. 1968) (en banc), based on an assumption that Congress intended the securities laws to have extraterritorial application "when a violation of the Rules is injurious to United States investors." Id.  Thus, the effects test focuses principally on "the impact of overseas activity on U.S. investors and securities traded on U.S. securities exchanges." EOC, 147 F.3d at 128.

"[G]eneralized effects" on American securities markets, such as

a loss of investor confidence or a decline in purchases by

foreign investors in U.S. markets, do not suffice. <u>Bersch</u>, 519

F.2d at 988.

Given the focus of the effects test on concrete harm to

U.S. investors and markets, an undifferentiated class of foreign

investors seeking damages will typically be unable to identify

any relationship between, on the one hand, the harm its members

suffered as a result of the alleged fraud and their foreign

trading and, on the other, any harm to U.S. markets or U.S.

investors such that the effects test will play any role in the

jurisdictional analysis.[7]  Such is certainly the case here, where

the Lead Plaintiffs have not even attempted to articulate how

the Foreign Plaintiffs' transactions had an effect on U.S.

investors or markets.  By contrast, an individual foreign

investor may on occasion reap some benefit from the combination

of the conduct and effects tests when it can point to a loss

sustained in the United States as a result of its trading.

<u>Compare</u> <u>Itoba</u>, 541 F.3d at 124 (considering under the effects

test that plaintiff's parent, 50% of whose shares were held in

the U.S., financed the foreign trading and bore the relevant

---

[7] Where a foreign plaintiff seeks injunctive relief it may be
appropriate to consider the effects of the alleged violation on
U.S. investors and U.S. markets.  <u>E.ON AG v. Acciona</u>, 468 F.
Supp. 2d 537, 548 (S.D.N.Y. 2006) (Cote, J.).

loss); and Leasco Data Processing Equip. Corp. v. Maxwell, 468

F.2d 1326, 1338 (2d Cir. 1972) (holding that where the nominally

foreign purchaser was "the alter ego of the American" parent, it

"would be elevating form over substance to hold that . . . the

purchases did not have a sufficient effect in the United States

to make § 10(b) apply"), with EOC, 147 F.3d at 128 (no U.S.

effect where plaintiff, persons who placed trading orders, and

person who suffered loss are foreign, and plaintiff could not

identify effect on U.S.-affiliated company).  Thus, the

existence of subject matter jurisdiction over the Exchange Act

claims brought by the Foreign Plaintiffs will rest entirely on

the outcome of the conduct test, on which the parties'

submissions have focused.

> Under the conduct test,
>
> jurisdiction exists only when substantial acts in
> furtherance of the fraud were committed within the
> United States, and that . . . test is met whenever (1)
> the defendants' activities in the United States were
> more than merely preparatory to a securities fraud
> conducted elsewhere and (2) the activities or culpable
> failures to act within the United States directly
> caused the claimed losses.

Berger, 322 F.3d at 193 (citation omitted).  Acts in the United

States may be "merely preparatory" if they "take the form of

culpable nonfeasance and are relatively small in comparison to

those abroad," Bersch, 519 F.2d at 987, are "far removed from

the consummation of the fraud," Psimenos v. E.F. Hutton & Co.,

14

_Inc._, 722 F.2d 1041, 1046 (2d Cir. 1983), or "where the bulk of the activity was performed in foreign countries," _Alfadda v. Fenn_, 935 F.2d 475, 478 (2d Cir. 1991).  Conduct may be "more than merely preparatory," however, where "the fraudulent scheme was masterminded and implemented by [the defendant] in the United States,"  _Berger_, 322 F.3d at 194, "conduct material to the completion of the fraud occurred in the United States," _Alfadda_, 935 F.2d at 478 (citation omitted), where "substantial acts in furtherance of the fraud were committed in the United States," _Berger_, 322 F.3d at 193 (citation omitted), where the "culminating acts of the fraudulent scheme" occurred in the United States, _Psimenos_, 722 F.2d at 1044, or where the U.S. conduct was "an essential link" in the fraud, _Leasco_, 468 F.2d at 1335 (citation omitted).

The Court of Appeals has conceded that "the distinction is a fine one," _IIT v. Vencap, Ltd._, 519 F.2d 1001, 1018 (2d Cir. 1975), and cautioned that "the presence or absence of any single factor which was considered significant in other cases dealing with the question of federal jurisdiction in transnational securities cases is not necessarily dispositive in future cases."  _IIT v. Cornfeld_, 619 F.2d 909, 918 (2d Cir. 1980) (citation omitted).  The task remains, however, to "arrive at our best judgment as to what Congress would have wished if these problems of extraterritorial application had occurred to it,"

EOC, 147 F.3d 128 (citation omitted), keeping in mind that "Congress did not want to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." Psimenos, 722 F.2d at 1045 (citation omitted).

Lead Plaintiffs argue that the conduct test is satisfied in this case because (1) most broadly, the alleged fraud concerned the loss reserves maintained by Converium North America; (2) defendant Smith, CEO of Converium North America, Brian Kensil, CFO of Converium North America ("Kensil"), and other Converium North America employees were intimately involved with the study of Converium North America's loss reserves, were aware of the massive reserve shortfall, repeatedly reported on the issue to Lohmann and Kauer in Switzerland, and were involved in the preparation of misleading financial information that obscured the shortfall; (3) Kensil conceived a plan in the United States to cover-up the problems at Converium North America by removing, without notifying investors, certain low-performing policies from Converium North America's books and novating those policies to Converium's European divisions (the "2003 Novations"), and this policy was discussed and adopted at a Converium board meeting held in Boston in August 2003; (4) at the Boston board meeting, the board also discussed and approved a change in the way that Converium structured the reporting of its financial

information, a change intended to conceal the Converium North America loss reserve deficiency and the significance of the 2003 Novations; (5) several other Converium board and committee meetings took place in the United States during the relevant period, and loss reserves and financial results were discussed at those meetings; (6) a regulatory directive from the Connecticut Department of Insurance was one factor driving Converium's efforts to resolve the reserve deficiency; (7) defendants Lohmann and Kauer conducted several conference calls with Wall Street analysts in the United States in which misrepresentations were made; and (8) false statements were incorporated into 6-K and 20-F filings with the SEC. Lead Plaintiffs contend that the combined magnitude of these U.S.-related acts is sufficient to confer subject matter jurisdiction over the claims of the Foreign Plaintiffs under the conduct test.

Defendants counter that (1) Lead Plaintiffs' consolidated amended complaint demonstrates, indeed emphasizes, that all decisions and directives regarding Converium North America's loss reserves -- including how the sufficiency of the loss reserves would be portrayed to the public and reported in Converium's financial disclosures -- were made by defendants Lohmann and Kauer in Switzerland; (2) the complaint also alleges that Lohmann (not Kensil) devised and executed the 2003

Novations, as well as the change in Converium's financial reporting, in Switzerland[8]; (3) filing documents with the SEC and conducting conference calls with Wall Street analysts is insufficient under the conduct test to confer subject matter jurisdiction, and that, in any event, (4) Lead Plaintiffs have not shown that the identified U.S. conduct directly caused the losses sustained by the Foreign Plaintiffs, as required under Berger, 322 F.3d at 193.

The Lead Plaintiffs have not carried their burden of demonstrating both sufficient conduct by the Defendants in the United States and a causal relationship between that conduct and the Foreign Plaintiffs' losses to justify the exercise of subject matter jurisdiction over the claims of the Foreign Plaintiffs. First, both the essential acts constituting the alleged fraud and the bulk of all the alleged fraudulent activity took place in Switzerland. Lead Plaintiffs' claims are based upon the approximately two-dozen false or misleading

---

[8] Defendants further deny that there was anything improper about the novation of contracts to Europe in 2003 and, citing publicly available documents, assert that the novation was disclosed to and approved by the Connecticut Department of Insurance, and was disclosed in the company's 20-F filed with the SEC in 2003 and in Converium North America's 2003 annual statement (filed with the State of Connecticut on May 27, 2004) contrary to the Lead Plaintiffs' allegations. The sufficiency of Converium's disclosure of the 2003 Novations is called into serious question, however, by (1) the nearly inscrutable way in which the novations are disclosed in those documents, and (2) contemporaneous analyst reports, which indicate that the market was not aware of the scope and significance of the novations.

statements concerning the financial health of Converium North America (and, by extension, Converium as a whole) made by the Defendants in press releases, conference calls, and SEC filings between the time of the IPO and the Fall of 2004. Each of these statements was issued by Converium from Switzerland and signed, certified, or actually spoken by defendants Lohmann or Kauer, both of whom operated out of Converium's Swiss headquarters.[9]

Second, the fraud was "masterminded" in Switzerland. Berger, 322 F.3d at 194. The key decisions underlying the alleged misrepresentations -- i.e., the decisions regarding how to address Converium North America's loss reserve problems, as well as how to represent those problems to the public -- were made in Switzerland. Although the allegations of the complaint do not control here, Space Hunters, 429 F.3d at 425-26, it must be noted that the complaint places remarkable emphasis on the "extensive control exerted by European management" over key decisions related to Converium North America. For example, relying on Confidential Witness No. 1, a reserving actuary at Converium North America during the proposed class period, the complaint alleges that although Converium North America's actuaries and executives studied and reported on the state of that division's loss reserves, once that information was

---

[9] As discussed below, the fact that documents were then filed with the SEC in the United States is not decisive here.

conveyed to Lohmann and Kauer, it was "Lohmann and Kauer [that]
then made the decision as to whether to strengthen reserves."
Confidential Witness No. 1 also reports, <u>inter alia</u>, that it was
Lohmann who "determined at the beginning of 2003 that Converium
would report $180 million of net income for 2003" despite his
knowledge of massive reserve deficiencies, and that it was
Lohmann and Kauer who, at a meeting in Zurich in June 2004,
asked U.S. executives, including Kensil, "to bury another $50
million in reserve deficiencies," a request that the witness
reports that the U.S. executives denied.[10]

---

[10] Other similar allegations of Swiss control over decisionmaking
include: (1) "Confidential Witness No. 1 stated that <u>Lohmann and
Kauer ultimately decided</u> that the maximum reserve increase the
Company could take and still conduct the IPO was $125 million,
and that he was ordered to get [insurance consultant]
Tillinghast to agree that that was the 'right number.'"
(emphasis added); (2) "According to Confidential Witness No. 1,
following the IPO, <u>reserving decisions</u> for Converium North
America <u>were specifically reviewed and approved by Converium
management in Switzerland</u>, including Defendants Lohmann and
Kauer. . . . Confidential Witness No. 1 explained Defendants
Lohmann's and Kauer's involvement in reviewing and approving
North American reserves, stating that, after the IPO 'we didn't
book anything without their ok.'" (emphasis added); (3) "Despite
their knowledge that the North American reserve deficiency was
growing by as much as $50 million a quarter during 2002, <u>Lohmann
and Kauer only permitted</u> Converium North America to book
additional reserves of $5-10 million for the first two quarters
of 2002, according to Confidential Witness No. 1." (emphasis
added); and (4) "Confidential Witness No. 6 stated that while he
and others pushed for immediate disclosure, Defendants Lohmann
and Kauer, as well as Jean-Claude Jacob [the Global Reserving
Actuary based in Switzerland], argued to delay the disclosure of
the Company's reserve deficiency."

The evidence offered in support of the instant motion does not contradict the complaint's allegation that key reserving decisions were ultimately made by Lohmann and Kauer in Switzerland, and not in the United States. Indeed, Lead Plaintiffs have offered no evidence that Converium North America's executives or actuaries themselves made material decisions regarding loss reserves or public disclosures.[11]

Broadly speaking, then, this is a case in which "the fraudulent scheme was masterminded and implemented" not "in the United States," as in <u>Berger</u>, 322 F.3d at 194, but in Switzerland. Lead Plaintiffs nevertheless contend that substantial and material conduct in furtherance of the alleged

---

[11] The record developed to this point indicates that employees of Converium North America were closely studying the loss reserve situation and reporting to their superiors in Switzerland precisely the figures that Lead Plaintiffs have now incorporated into their complaint, thus implying that such figures were accurate. Indeed, the story offered by the Lead Plaintiffs in the complaint -- and not significantly altered by the evidence submitted in connection with the instant motion -- is not one in which Converium North America employees secretly manipulated their numbers in order to impress the unwitting home office in Switzerland, which then innocently incorporated those numbers into their financial reports, but rather one in which the home office, having received accurate reports of deficient loss reserves from North America, decided to orchestrate a scheme by which those deficiencies would be hidden from investors. While that scheme necessarily involved communication with the North American employees and directives from Switzerland to those employees regarding financial reporting, taking the Lead Plaintiffs' story on its own terms, the United States aspect of the alleged fraud is thus one best characterized by "the failure [by those in the United States] to prevent fraudulent acts where the bulk of the activity was performed in foreign countries." <u>IIT v. Vencap, Ltd.</u>, 519 F.2d at 1018.

fraud did take place in the United States, and that such a showing is sufficient under the conduct test. While that is undoubtedly so as a matter of law, the evidence offered by the Lead Plaintiffs falls short of the required showing.

Lead Plaintiffs assert that -- contrary to the allegations of Confidential Witness No. 1 in the complaint -- it was Kensil who "came up with" the 2003 Novations as a means for hiding Converium North America's reserve deficiencies, and that the "novations were approved and agreed to in Boston" at a Converium board meeting. The evidence submitted in support of this claim, however, cannot bear the weight Lead Plaintiffs have placed upon it.

Lead Plaintiffs point to a July 16, 2003 email sent by Kensil to Kauer, Lohmann, Smith, and others, in which Kensil suggests that, in order to convince PricewaterhouseCoopers ("PWC"), an outside auditing firm, that the company did not need to report a $25 million "adverse [loss] development" in the second quarter of 2003, it would be necessary to "effect novations in the near future," provided that "the[re] were adequ[]ate [reserve] redundancies in Zurich" to justify the transaction. Kauer's response the next day indicated that he approved of the plan.[12]  It must be noted, however, that the

_____

[12] Kauer wrote, "We have to do that anyway, why not confirm it to PWC."

record provides no basis for concluding that the concept of novating low-performing contracts from the United States to Europe was improper or fraudulent in and of itself, and thus Kensil's suggestion is not indicative of the "masterminding" of a fraud within the United States, or even of "conduct material to the completion of the fraud." Alfadda, 935 F.2d at 478 (citation omitted). As Defendants note, the 2003 Novations were, in fact, approved by the Connecticut Department of Insurance, and Lead Plaintiffs do not appear to argue that such novations are inherently fraudulent or misleading -- assuming, of course, appropriate disclosure.

Thus, the fraud, if any, consisted in the failure adequately to disclose to investors the nature, scope, or significance of the novations, namely, that Converium North America was continuing to experience problems with the loss reserves for policies written between 1996 to 2000. On this point, Lead Plaintiffs assert that the decisions to proceed with the novations and not to disclose that fact were made at the board meeting in Boston, at which time, according to Lead Plaintiffs, "the Company decided to implement a 'change in segment reporting' specifically to conceal the novation." More specifically, Lead Plaintiffs allege that Converium decided at the board meeting to change its financial reporting from a geographic system (in which results were reported by region) to

a line-of-business system (in which results were reported by insurance type, such as property, specialty, and life/health) with the goal of covering up the 2003 Novations.

Again, however, the evidence submitted by the Lead Plaintiffs in support of the class claims does not fully support its version of events. In short, the Boston meeting appears to have played a far more incidental role in the novation and reporting decisions. The minutes of the August 26, 2003 meeting in Boston do reflect significant discussion of the novations, the disclosure of the novations, the new financial reporting system, and the relationship among those three plans, but not the conception or final approval of any of these plans. Indeed, the minutes reflect that the novation plan had already been provisionally approved before the Boston meeting. In addition, although the discussion at the Boston meeting indicates the company's awareness that the change in reporting would have the effect of concealing the novations[13] -- and, by extension, the

---

[13] At the Boston meeting, the Chairman of the Board stated that there is "a certain problem in the fact that Converium may be called to provide further follow-up information on the basis of the old segmentation, which might defeat the purpose of the novations." Based on this statement, it appears that the "purpose" of the novations was understood to be to minimize the appearance of loss reserve problems in North America, a purpose that would be "defeat[ed]" without the simultaneous change in the reporting structure. Kauer responded to this statement by promising that "Converium would not entertain such a request [for geographic reporting information] once the new segment reporting is implemented," thus ensuring that the significance

continued weakness of the loss reserves in North America -- the
record does not reflect, as Lead Plaintiffs argue, that the
board "decided to implement" the new reporting system at the
Boston meeting.[14]  Rather, the minutes conclude with an
indication that the new reporting system would be discussed
further the next day, and a July 26, 2003 email from Kauer
indicates that a final decision on that system was not scheduled
to be made until August 29, 2003.[15]  In short, the evidence
submitted regarding (1) Kensil's proposal regarding the novation
plan, and (2) the Boston board meeting, does not indicate that
significant elements of the alleged fraud were "masterminded . .
. in the United States," Berger, 322 F.3d at 194, that
"substantial acts in furtherance of the fraud were committed in
the United States," id. at 193, or even that these U.S.

---

of the novations would not be apparent.  This refusal to produce
historical information did not go unnoticed.  As a Citigroup
analyst wrote on February 18, 2004, "credibility about
accounting transparency remains an issue for this company," and
cited as evidence of that fact that "Converium changed the
structure of its accounts to reporting by business line, rather
than by legal entity, and produced little historical information
on the new basis."

[14] The complaint also alleges that "it was Jean-Claude Jacob's
[the Global Chief Actuary in Switzerland] idea to reorganize
Converium to deemphasize the North American operation."

[15] Whether the key decisionmakers would have still been in the
United States at that time is not apparent.  The email states
that the "Board-meeting (Boston)" was scheduled for "August 25-
27," but that the "decision regarding change [of] segment
structure" would be made on August 29 at a location that is not
apparent from the email.

activities were an "essential link" in the fraud, <u>Leasco Data Processing</u>, 468 F.2d at 1335 (citation omitted).

Third, Lead Plaintiffs' remaining allegations of U.S. conduct are likewise insufficient. The fact that the subject of the alleged fraud was Converium's North American business unit is not "conduct" in the United States. While it is far more likely that conduct material to the fraud will occur in the United States when the fraud consists of the concealment of negative information about American business operations, the plaintiff must nonetheless identify the locus of decisionmaking and other wrongful conduct to show that substantial acts that furthered the fraud were actually committed in this country. Similarly, the fact that pressure from the Connecticut Department of Insurance to strengthen reserves was a factor in the company's decision to effectuate the 2003 Novations does not suggest a finding of jurisdiction in the absence of an allegation that the company's dealings with that agency in the United States were fraudulent or misleading.[16]

---

[16] This case is thus distinct from <u>In re Gaming Lottery Securities Litigation</u>, 58 F. Supp. 2d 62 (S.D.N.Y. 1999), in which a key act in the alleged fraudulent scheme was the deliberate deception of a state regulatory agency, in that case the Washington State Gambling Commission. <u>Id.</u> at 74. Here, the Connecticut Department required Converium North America to strengthen its reserves by $205 million in 2003, and Converium decided to do so partly through the novations, a process that was approved by the agency. Although Lead Plaintiffs allege that the subsequent concealment of the novations from the public

The allegedly misleading SEC filings require more
discussion.  They of course constitute U.S. conduct even though
they were prepared abroad.  Otherwise, "the protection afforded
by the Securities Exchange Act could be circumvented simply by
preparing SEC filings outside the United States."  <u>Berger</u>, 211
F.3d at 195 (citation omitted).  But, while relevant, the act of
filing documents with the SEC is insufficient standing alone to
confer jurisdiction in an action for damages.  <u>See</u> <u>Itoba</u>, 54
F.3d at 123-24.[17]  Foreign investors may not bring private claims
for damages in United States courts simply by alleging that
false statements were made in SEC filings.[18]

---

was fraudulent and misleading, they do not allege that Converium
deceived the agency in the process.

[17] Similarly, the Lead Plaintiffs have failed to show that the
conference calls they mention should be given much weight in the
assessment of wrongful conduct occurring in the United States.
Lead Plaintiffs have alleged that these conference calls took
place with unnamed "Wall Street analysts" in the United States,
but have not offered additional information regarding the
connection between those calls and the United States.  Certain
of Converium's press releases (for example, the key July 20,
2004 release), which solicited participation in the conference
calls, indicate that participants from Europe, the United
Kingdom, Canada, and Mexico -- as well as the United States --
were each invited to call-in to participate, and that conference
calls were scheduled on Central European Time.  The complaint
also indicates that the allegedly misleading statements made on
these calls were made by Lohmann or Kauer from Switzerland.

[18] Moreover, even assuming that SEC filings were sufficient under
the first prong of the conduct test, a Foreign Plaintiff would
still have to demonstrate that those filings "directly caused"
the losses they suffered.  <u>Berger</u>, 322 F.3d at 193 (citation
omitted).  As noted below, no such showing has been made here.

Fourth and finally, Lead Plaintiffs' motion papers essentially ignore the second prong of the conduct test -- the requirement that "the activities or culpable failures to act within the United States directly caused the claimed losses." Berger, 322 F.3d at 193 (citation omitted). Lead Plaintiffs devote all of their attention to documenting instances of alleged U.S. conduct, but have not made any showing calculated to satisfy their burden of affirmatively demonstrating the causal connection between those acts -- individually or collectively -- and the losses claimed by the Foreign Plaintiffs.

Given that Lead Plaintiffs bear the burden of proof on this issue, Aurecchione, 426 F.3d at 638, their failure to offer an argument on this point is telling. In any event, to the extent an argument on this point can be implied from the evidence and argument submitted, it also fails. The "[d]etermination whether American activities 'directly' caused losses to foreigners depends not only on how much was done in the United States but also on how much . . . was done abroad." IIT v. Cornfeld, 619 F.2d at 920-21. Given that the misrepresentations that form the basis for the Foreign Plaintiffs' cause of action all emanated from abroad, and that each of the decisions underlying those statements was also made abroad, the alleged U.S. conduct identified by the Lead Plaintiffs, considered collectively, is

far outweighed by the relevant foreign conduct, and thus the causal connection between the U.S. conduct and the Foreign Plaintiffs' alleged losses is simply too attenuated to be accurately described as "direct."

In sum, then, Lead Plaintiffs have not met their burden of affirmatively demonstrating either that (1) the Defendants' activities in the United States were more than merely incidental to a fraud conducted elsewhere, or (2) that the U.S. conduct that has been identified directly caused the losses claimed by the Foreign Plaintiffs. As a result, subject matter jurisdiction over the claims of the Foreign Plaintiffs does not exist, and they are dismissed from this action. See Bersch, 519 F.2d at 997. "Fraud there might have been, and [the Foreign Plaintiffs] may very well have been damaged by its perpetration. But the dispute here presented is rightfully resolved in the courts of another land." Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A., 606 F.2d 5, 10 (2d Cir. 1979).[19]

_____

[19] Lead Plaintiffs have not requested that the Court exercise supplemental jurisdiction over the Foreign Plaintiffs' claims, see 28 U.S.C. § 1367, and it is highly doubtful that such an action would be appropriate in any event. See In re Literary Works in Elec. Databases Copyright Litig., 509 F.3d 116, 127-28 (2d Cir. 2007) (holding that the statute "precludes" the exercise of "supplemental jurisdiction over jurisdictionally-deficient federal claims asserted together with another, jurisdictionally-proper [federal] claim"); cf. Bersch, 519 F.2d at 996 (holding that it would have been "an abuse of discretion"

II.  Requirements for Class Certification

"[A] district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met."  In re Initial Pub. Offering Sec. Litig. ("In re IPO"), 471 F.3d 24, 41 (2d Cir. 2006).  Thus, the Lead Plaintiffs will be able to sue Defendants as representatives of a class

> only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(a), Fed. R. Civ. P.  Once these criteria are satisfied, an action may be maintained as a class action only if it also qualifies under at least one of the categories provided in Rule 23(b).  Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 104 (2d Cir. 2007).  In this case, Lead Plaintiffs seek to certify a class under Rule 23(b)(3), which permits certification where "the court finds that the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and

---

to exercise pendent jurisdiction over the state-law claims of a class of foreign plaintiffs in that action).  Furthermore, it is far from clear that the exercise of such jurisdiction would advance the "values of judicial economy, convenience, fairness, and comity."  Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997) (citation omitted).

efficiently adjudicating the controversy." Rule 23(b)(3), Fed.
R. Civ. P. The burden of proving compliance with all of the
requirements of Rule 23 rests with the party moving for
certification. In re IPO, 471 F.3d at 40.

Following a detailed review of its prior jurisprudence, the
Court of Appeals clarified in In re IPO the standard to be
applied in addressing motions for class certification. The
Court of Appeals held that

> determinations [regarding the Rule 23 requirements]
> can be made only if the judge resolves factual
> disputes relevant to each Rule 23 requirement and
> finds that whatever underlying facts are relevant to a
> particular Rule 23 requirement have been established
> and is persuaded to rule, based on the relevant facts
> and the applicable legal standard, that the
> requirement is met; [] the obligation to make such
> determinations is not lessened by overlap between a
> Rule 23 requirement and a merits issue, even a merits
> issue that is identical with a Rule 23 requirement;
> [and] in making such determinations, a district judge
> should not assess any aspect of the merits unrelated
> to a Rule 23 requirement; . . . .

Id. at 41. In sum, "the district judge must receive enough
evidence, by affidavits, documents, or testimony, to be
satisfied that each Rule 23 requirement has been met." Id.

Lead Plaintiffs have carried their burden under Rule
23 of showing that a class action is both appropriate and
the superior method of addressing the issues that remain in
this case. The principal debate between the parties
concerning Rule 23's requirements are the starting and

ending dates for the class period. The Lead Plaintiffs

have not shown that the market in Converium securities was

efficient until January 7, 2002, that is, the end of the

"quiet period" following the IPO. They have shown,

however, that the class period may extend to September 2,

2004.

A.   Rule 23(a) Threshold Requirements

   1.   Numerosity

   Rule 23(a) requires a finding that the numerosity of the

putative class makes joinder of all class members

"impracticable." To satisfy this requirement, joinder need not

be "impossible," but "the difficulty or inconvenience of joining

all members of the class [must] make use of the class action

appropriate." Cent. States Se. & Sw. Areas Health & Welfare

Fund v. Merck-Medco Managed Care, L.L.C., 504 F.3d 229, 244-45

(2d Cir. 2007). Numerosity is presumed when a class consists of

forty or more members. Consol. Rail Corp. v. Town of Hyde Park,

47 F.3d 473, 483 (2d Cir. 1995). Lead Plaintiffs have shown and

Defendants do not contest the numerosity of the proposed class.[20]

---

[20] As used below, the phrase "proposed class" should be read as
excluding dismissed claims of the Foreign Plaintiffs.

2.  Commonality

"The commonality requirement is met if plaintiffs'
grievances share a common question of law or of fact."  Cent.
States, 504 F.3d at 245 (citation omitted).  Even a single
common legal or factual question will suffice.  See In re Agent
Orange Prod. Liab., 818 F.2d 145, 166-67 (2d Cir. 1987).

There are several common questions of law or fact shared by
members of the proposed class.  Among these are whether the
Defendants' public statements, discussed above, contained
material misrepresentations or omissions in violation of
Section 10(b), and whether Defendants acted with scienter.
Defendants do not argue that there is not a common question of
law or fact that would support a finding of commonality.


3.  Typicality

The claims of the members of the proposed class are typical
of those of the class when "each class member's claim arises
from the same course of events, and each class member makes
similar legal arguments to prove the defendant's liability."
Cent. States, 504 F.3d at 245 (citation omitted).  The
typicality and commonality requirements tend to merge into one
another as both "serve as guideposts for determining whether the
named plaintiff's claim and the class claims are so inter-
related that the interests of the class members will be fairly

and adequately protected in their absence." <u>Caridad v. Metro</u>
<u>North Commuter R.R.</u>, 191 F.3d 283, 291 (2d Cir. 1999) (quoting
<u>Gen. Tel. Co. v. Falcon</u>, 457 U.S. 147, 157, n.13 (1982)).

Here, each potential class member's claim arises from the
same course of events, namely, the alleged series of misleading
or fraudulent statements made by the Defendants, and the
subsequent effect of those statements on the market for
Converium shares and ADSs.  All potential members' claims are
also based on the same legal theories under Sections 10(b) and
20(a), and with respect to other common issues, including loss
causation.  Consequently, the typicality requirement is met in
this case.  Defendants do not contend otherwise.


    4.  Adequacy of Representation

    "[A]dequacy of representation entails inquiry as to
whether: 1) plaintiff's interests are antagonistic to the
interest of other members of the class and 2) plaintiff's
attorneys are qualified, experienced and able to conduct the
litigation."  <u>Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.</u>,
222 F.3d 52, 60 (2d Cir. 2000); <u>see also</u> <u>Cent. States</u>, 504 F.3d
at 245-46.  The adequacy inquiry "serves to uncover conflicts of
interest between named parties and the class they seek to
represent."  <u>Amchem</u>, 521 U.S. at 625.  Not every potential
conflict will preclude a finding of adequacy, however.  <u>In re</u>

34

Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 145 (2d
Cir. 2001). "The conflict that will prevent a plaintiff from
meeting the Rule 23(a)(4) prerequisite must be fundamental," and
"speculative conflict should be disregarded at the class
certification stage." Id. (citation omitted). Conflicts that
"go[] to the very heart of the litigation," Cent. States, 504
F.3d at 246, however, will prevent certification.

Defendants have not identified any conflicts rendering Lead
Plaintiffs -- or, more specifically, sole remaining Lead
Plaintiff PERSM -- inadequate to represent the potential class,
or raised any qualms regarding the qualification of Lead
Plaintiffs' counsel. Lead Plaintiffs have demonstrated that
they "posses the same interest and suffer[ed] the same injury as
the class members," Amchem, 521 U.S. at 625-26 (citation
omitted), namely, an interest in remedying the harm caused by
the Defendants' alleged misrepresentations to the public
regarding Converium and Converium North America. Moreover,
there is no reason to believe that Lead Plaintiffs' counsel
lacks the competency to handle the class action. Lead
Plaintiffs can be trusted to represent fairly and adequately the
interests of the class in this action, and thus the adequacy
requirement is met.

B.    Rule 23(b)(3) Requirements

    To qualify for class treatment under Rule 23(b)(3), Lead
Plaintiffs must demonstrate predominance, _i.e._, that "the
questions of law or fact common to the members of the class
predominate over any questions affecting only individual
members," and superiority, _i.e._, "that a class action is
superior to other available methods for the fair and efficient
adjudication of the controversy."  _Cordes & Co._, 502 F.3d at 104
(citation omitted).  Together, these requirements "ensure[] that
the class will be certified only when it would 'achieve
economies of time, effort, and expense, and promote uniformity
of decision as to persons similarly situated, without
sacrificing procedural fairness or bringing about other
undesirable results.'"  _Id._ (quoting _Amchem_, 521 U.S. at 615).
Each of these requirements will be discussed separately below.


    1.    Predominance

    "The predominance requirement is met if the plaintiff can
establish that the issues in the class action that are subject
to generalized proof, and thus applicable to the class as a
whole, predominate over those issues that are subject only to
individualized proof."  _Id._ at 107-08 (citation omitted).  In
making this determination, a court considers whether the
putative class members "could establish each of the . . .

required elements of [their] claim[s]. . . using common evidence." Visa Check, 280 F.3d at 136. The Supreme Court has noted that this is "a test readily met in certain cases alleging consumer or securities fraud." Amchem, 521 U.S. at 625.

In order to state a claim under Section 10(b) of the Exchange Act, "a plaintiff must establish that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir. 2003) (citation omitted).[21] With one exception, it is not disputed that each of the elements necessary to establish liability under Section 10(b) here -- e.g., the false or misleading nature of the Defendants' public statements or omissions, the materiality of those statements or omissions, the Defendants' state of mind in issuing those

---

[21] As described in the December 2006 Opinion, at *14, the two elements of a Section 20(a) claim, which is brought here against the Officer Defendants, are "(1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant." In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 414 (S.D.N.Y. 2003). There is no dispute here that, provided there is predominance with respect to the Section 10(b) claim -- i.e., the "primary violation" -- the predominance requirement will also be met with respect to the Section 20(a) claim, as the issue of control is susceptible to generalized proof. Thus, the analysis will focus on the Section 10(b) claim.

statements, and the loss caused by the statements or omissions -
- are susceptible to generalized proof using common evidence.

To establish that the key issue of reliance is likewise
susceptible to common proof, however, Lead Plaintiffs invoke the
"fraud-on-the-market" doctrine established in Basic Inc. v.
Levinson, 485 U.S. 224, 245-47 (1988). While Defendants do not
contest that the market for Converium shares and ADSs on the SWX
and NYSE was efficient during the vast majority of the proposed
class period, and thus that the issue of reliance would be
susceptible to common proof under Basic, Defendants argue that
Lead Plaintiffs have failed to establish that the Converium
market was efficient prior to January 7, 2002, and that those
who purchased before that date should be excluded from the
proposed class. Lead Plaintiffs contend that (1) the Converium
market was efficient on the day of the IPO, December 11, 2001;
(2) if not, it was efficient the day after the IPO, on December
12; and (3) that, even assuming Defendants' argument is correct,
those who purchased before January 7, 2002, should still be
included in the class. For the reasons stated below, individual
issues of reliance will predominate over common issues during
the period prior to January 7, 2002, and purchasers of Converium
shares and ADSs on the SWX and NYSE before that date will not be
included in the certified class.

Lead Plaintiffs' first contention, that the Converium market was efficient on the day of the IPO, may be swiftly rejected. The December 2006 Opinion dismissed all Exchange Act claims brought based upon misrepresentations allegedly made in connection with the Converium IPO. The December 2006 Opinion noted that, in In re IPO, the Court of Appeals "held as a matter of law that 'the market for IPO shares is not efficient.'" December 2006 Opinion, at *13 (quoting In re IPO, 471 F.3d at 42). While declining to hypothesize whether, after In re IPO, it would be possible to plead facts "sufficient to allege the existence of an efficient market for an initial public offering and to support a presumption of reliance," the Opinion clearly held that the instant complaint had failed to do so, as it did not include any allegations on that point. Id.

Although, following a motion for reconsideration, this holding was amended to permit claims based upon misrepresentations allegedly made in connection with the Converium IPO by those who purchased in the aftermarket, In re Converium Holding AG Sec. Litig., 2007 WL 1041480, at *2, the December 2006 Opinion's dismissal of claims brought by those who purchased directly in the IPO was never challenged or disturbed. That holding is thus the "law of the case" and will not be revisited, as Lead Plaintiffs have not pointed to "an intervening change of controlling law, the availability of new

evidence, or the need to correct a clear error or prevent manifest injustice." <u>United States v. Becker</u>, 502 F.3d 122, 127 (2d Cir. 2007) (citation omitted); <u>see also</u> <u>Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd.</u>, 956 F.2d 1245, 1255 (2d Cir. 1992).[22] While the law of the case doctrine is discretionary, <u>Arizona v. California</u>, 460 U.S. 605, 618 (1983), in light of the posture of the case and the failure of the Lead Plaintiffs to identify any compelling reason why, "hav[ing] once battled for the court's decision, they should . . . be . . . permitted[] to battle for it again," <u>Zdanok v. Glidden Co.</u>, 327 F.2d 944, 953 (2d Cir. 1964), Lead Plaintiffs will not be allowed to relitigate this issue.[23]

The question presented, then, is whether the market for Converium shares and ADSs was, prior to January 7, 2002, "efficient" as that term has been interpreted in the fraud-on-the-market context. By invoking the fraud-on-the-market

_____

[22] Although the evidence offered by Lead Plaintiffs on this issue has not previously been submitted to this Court, it is not "new" evidence that was not previously "available" within the meaning of the law of the case doctrine, as it is publicly available information to which Lead Plaintiffs had access long before the instant motion was filed.

[23] Lead Plaintiffs also request leave to amend their complaint in order to append the additional facts contained in the motion papers related to the efficiency of the IPO market. For the reasons stated below in connection with the analysis of the post-IPO "quiet period," that request is denied, as such amendment would be futile. <u>Fielding v. Tollaksen</u>, 510 F.3d 175, 178 (2d Cir. 2007) (citing <u>Advanced Magnetics, Inc. v. Bayfront Partners, Inc.</u>, 106 F.3d 11, 18 (2d Cir. 1997).

doctrine, plaintiffs in securities class actions are able to allege and eventually establish the required element of "[t]ransaction causation," which "is akin to reliance," and requires a plaintiff to show that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005) (citation omitted). "The fraud-on-the-market doctrine . . . creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value." In re IPO, 471 F.3d at 42 (citation omitted). This presumption is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." Basic, 485 U.S. at 241 (citation omitted). As a result, "[m]isleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." Id. at 242 (citation omitted).

Thus, in order to invoke the fraud-on-the-market presumption, a plaintiff must establish that the security at issue traded in a market that "reflect[ed] all publicly available information, and, hence, any material

misrepresentations." Id. at 246. Such a market is commonly referred to as an "efficient" market. See In re IPO, 471 F.3d at 42. See generally In re PolyMedica Corp. Sec. Litig., 432 F.3d 1, 10 (1st Cir. 2005) (citing cases). To determine whether a market for a security is efficient, courts often look to the five factors described in Cammer v. Bloom, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989): (1) a large weekly trading volume; (2) a significant number of securities analysts following and reporting on a company's stock; (3) the presence of market makers and arbitrageurs who are able to react swiftly to company news and drive the stock price; (4) the eligibility of the company to file an S-3 Registration Statement for its public offerings; and (5) empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. See also In re PolyMedica, 432 F.3d at 4 (noting that the Cammer factors are "widely-accepted"); id. at 14 (vacating opinion of district court deviating from this "prevailing definition of market efficiency"); Unger v. Amedisys Inc., 401 F.3d 316, 323 (5th Cir. 2005).[24]

---

[24] While the Court of Appeals for the Second Circuit has not explicitly endorsed the Cammer factors, or any other set of factors, In re IPO, 471 F.3d at 42, did rely upon the analysis of market efficiency offered in Freeman v. Laventhol & Horwath, 915 F.2d 193, 199 (6th Cir. 1990), which, in turn, relied upon the Cammer factors. See id.

Defendants do not dispute that the market for Converium shares and ADSs was efficient after January 7, 2002. Defendants have chosen that date because it is the first trading day following the end of the "quiet period" discussed in In re IPO, 471 F.3d at 43. In that case, the Court of Appeals stated that,

> [a]s just one example of why an efficient market, necessary for the Basic presumption to apply, cannot be established with an IPO, we note that during the 25-day "quiet period," analysts cannot report concerning securities in an IPO, thereby precluding the contemporaneous "significant number of reports by securities analysts" that are a characteristic of an efficient market.

Id. at 42-43 (citation omitted). Defendants contend that this language indicates that a market for securities during the so-called "quiet period" is inherently inefficient as a matter of law. While Defendants' contention on this point goes too far, an understanding of the purpose underlying the existence of the quiet period, along with the quoted language from In re IPO, combine to establish at least a rebuttable presumption that a market for securities issued by a company not previously subject to the reporting requirements of the securities laws is not efficient during the quiet period.[25]

---

[25] That a lead plaintiff may have difficulty showing that reliance may be presumed during the quiet period and therefore have difficulty obtaining certification of a class action for Exchange Act claims arising out of a registration statement does not leave a putative class without a remedy. "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case" for a claim under Section 11

Unless otherwise provided by the SEC and with certain

exceptions, during the period specified in 15 U.S.C. §

77d(3)(B), any "dealer"[26] must deliver a prospectus complying

with Section 10(a) of the Securities Act in connection with any

secondary market transaction in a security registered under the

Securities Act (the "Prospectus Delivery Period").  See 15

U.S.C. § 77d(3)(B); Prospectus Delivery for Aftermarket

Transactions, Securities Act Release No. 6763, Exchange Act

Release No. 25546, 53 Fed. Reg. 11841, 1988 WL 237444, at *1

(Apr. 4, 1988).[27]  The term "prospectus" is defined broadly under

---

of the Securities Act.  Herman & MacLean v. Huddleston, 459 U.S.
375, 382 (1983).  Provided that class members either purchased
directly in the IPO, within twelve months after the registration
statement becomes effective, or prior to an earnings statement
that meets the statute's requirements, see generally 15 U.S.C.
§ 77k; DeMaria v. Andersen, 318 F.3d 170, 175 (2d Cir. 2003); In
re WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 288-89 (S.D.N.Y.
2003), they may bring such claims without proving reliance.  The
Securities Act claims in this action, however, were not timely
filed.  December 2006 Opinion, at *15-17.

[26] The term "dealer" is defined broadly, and includes "any person
who engages either for all or part of his time, directly or
indirectly, as agent, broker, or principal, in the business of
offering, buying, selling, or otherwise dealing or trading in
securities issued by another person."  15 U.S.C. § 77b(12).  Cf.
Byrnes v. Faulkner, Dawkins & Sullivan, 550 F.2d 1303, 1311 (2d
Cir. 1977) (discussing the Prospectus Delivery Period and its
application to "dealers").

[27] See generally Harold S. Bloomenthal & Samuel Wolff, 1B Going
Public and the Public Corporation § 10:1 (2007) (providing an
overview of the registration process).  Bloomenthal and Woolf
note that the registration process under the Securities Act has
three stages:

   (1) the pre-filing period; (2) the waiting period; (3)
   the post-effective period.  The pre-filing period

the Securities Act.  <u>See</u> 15 U.S.C. § 77b(10).  Thus,

commentators have advised that "[r]esearch reports can easily be

deemed to be within the [statutory] definition" of that term,

Jonathan A. Shayne & Larry D. Soderquist, <u>Inefficiency in the</u>

<u>Market for Initial Public Offerings</u>, 48 Vand. L. Rev. 965, 982

n.73 (1995), and during the Prospectus Delivery Period "dealers

refrain from issuing research reports and other communications

lest such communications be deemed prospectuses that do not meet

the requirements" of the Securities Act.  Prospectus Delivery

During Quiet Period, Securities Act Release No. 6682, 37 S.E.C.

Docket 260, 1986 WL 703857, at *2 n.18 (Dec. 18, 1986); <u>see also</u>

Shayne & Soderquist, 48 Vand. L. Rev. at 982-83.[28]  As a result,

---

commences with the decision to go public; an issuer is
often said to be 'in-registration' from that point on.
. . .  The filing of the registration statement with the
SEC ends the pre-filing period and commences the waiting
period.  During the waiting period, the SEC's staff
reviews the registration statement, the managing
underwriter attempts to form an underwriting and a
selling group, and the marketing of the issue takes
place. . . .  The waiting period ends and the post-
effective period commences when the registration
statement becomes effective and after the issue is
priced.  After the registration statement becomes
effective and the issue priced, . . . confirmations,
accompanied or preceded by a definitive prospectus, are
sent to all persons purchasing the registered securities.

<u>Id.</u>

[28] That the Supreme Court held in <u>Gustafson v. Alloyd Co., Inc.</u>,
513 U.S. 561 (1995), that "the term 'prospectus' relates to
public offerings by issuers and their controlling shareholders,"
and not to documents related to private offerings, <u>id.</u> at 576,
does not affect this analysis.

the Prospectus Delivery Period is generally "quiet" with respect

to analyst reports.  *Prospectus Delivery During Quiet Period*,

1986 WL 703857, at *2.

Pursuant to the authority granted to it by 15 U.S.C.

§ 77d(3)(B), the SEC has promulgated 17 C.F.R. § 230.174(d),

which shortens the Prospectus Delivery Period to twenty-five

days with respect to aftermarket purchases made in connection

with registered shares traded on a major exchange and issued by

a company not previously subject to the reporting requirements

of the Securities Act.[29]  The reasoning offered by the SEC in

adopting the shortened twenty-five day period is worthy of note

in light of the question presented by the parties in this case.

The SEC stated that the Prospectus Delivery Period "is a

prophylactic measure which reduces the vulnerability of the

offering process to hot issues abuses," *Prospectus Delivery*

*During Quiet Period*, 1986 WL 703857, at *4, such as the use of

---

[29] 17 C.F.R. § 230.174(d) provides that:

> If (1) the registration statement relates to the security
> of an issuer that is not subject, immediately prior to
> the time of filing the registration statement, to the
> reporting requirements of section 13 or 15(d) of the
> Securities Exchange Act of 1934, and (2) as of the
> offering date, the security is listed on a registered
> national securities exchange or authorized for inclusion
> in an electronic inter-dealer quotation system sponsored
> and governed by the rules of a registered securities
> association, no prospectus need be delivered after the
> expiration of twenty-five calendar days after the
> offering date.

(emphasis added).

"promotional market letters, advisory recommendations, articles in the financial press and other planned publicity" during the period following an IPO, which can cause artificial demand for IPO securities. Id. at *3. The SEC considered the reduction or elimination of the quiet period in the late 1980s because, it concluded, "[m]arket information is disseminated more efficiently" in the modern securities market, id. at *2, and thus markets were now perhaps less vulnerable to "market manipulation and other hot issue abuses." Prospectus Delivery for Aftermarket Transactions, 1988 WL 237444, at *2.

Significantly, however, the complete elimination of the quiet period was rejected due to "[d]oubts . . . about whether, immediately after completion of an initial public offering, information concerning the issuer will have been disseminated as broadly as information relating to comparable companies having a reporting history under the Exchange [A]ct." Id. at *3. This concern appears to have been based in large part on data indicating that, immediately following an IPO, there is typically an "abnormal volume" of trading, and the data collected showed that "the level of trading becomes normal" sometime between the twenty-third and fifty-sixth calendar day after the offering. Id. at *3-4 & nn.21, 24. The SEC therefore settled on the twenty-five day period because, it was advised, "a reduced prospectus delivery period of 25 calendar days should

provide a reasonable time for the secondary market to assimilate available information and to stabilize." Id. at *5.[30]

In short, the regulatory history in this area indicates that, in the opinion of the SEC, during the twenty-five day quiet period the market in a new security has likely not yet become "efficient" as that term is understood in the fraud-on-the-market context -- i.e., such a market does not yet "reflect[] all publicly available information." Basic, 485 U.S. at 246. While it has been asserted that the Internet and other "technological advances" now "ensure that information permeates the market faster than ever before," and thus the fraud-on-the-market doctrine may apply to the "immediate aftermarket of an IPO" in the contemporary context, In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 376-77 (S.D.N.Y. 2003),[31] the Court of Appeals essentially rejected that view in In re IPO by

---

[30] See also David A. Lipton, Broker Dealer Regulation § 3:46 (2007).

[31] Indeed, in recognition of the fact that "information regarding all issuers is largely disseminated other than through physical delivery" in today's securities market, 17 C.F.R. § 230.174 was amended in 2005 to eliminate the requirement that prospectuses be physically delivered in order to comply with the requirements of the Securities Act. See Securities Offering Reform, Securities Act Release No. 8591, Exchange Act Release No. 52056, 2005 WL 1692642, at *107 (Aug. 3, 2005); see also Harold S. Bloomenthal & Samuel Wolff, Going Public Handbook §§ 3:41, 3:39 (2007).

emphasizing the continued importance of the quiet period, even in today's securities market. 471 F.3d at 43.[32]

Viewed in this context, Lead Plaintiffs' claim that the market for Converium shares on the SWX and for Converium ADSs on the NYSE was "efficient" as of the day following the IPO and during the quiet period prior to January 7, 2002 does not succeed, as they have not offered "enough evidence, by affidavits, documents, or testimony, to . . . satisf[y]" this Court on this point. Id. at 41. For example, although Lead Plaintiffs have identified one analyst report that was issued by HSBC during the quiet period (December 13, 2001), it is apparent from Lead Plaintiffs' expert submission that a "significant number of reports by securities analysts" were not issued until mid-January or February of 2002. In re IPO, 471 F.3d at 43.[33]

---

[32] It should be noted that the Court of Appeals based its view of the inefficiency of the IPO market on the absence of analyst reports during the twenty-five day quiet period, In re IPO, 471 F.3d at 43, and not on the information inefficiency of markets in the immediate post-IPO period, as the SEC did in adopting the rule. Prospectus Delivery for Aftermarket Transactions, 1988 WL 237444, at *5. Nevertheless, these two lines of reasoning are not mutually exclusive or even contradictory; indeed, they reinforce one another, insofar as both views lead to a conclusion that the IPO and immediate post-IPO quiet period should be considered an unlikely candidate for the application of the fraud-on-the-market doctrine.

[33] Lead Plaintiffs also point to pre-IPO coverage of ZFS, Converium's former parent company, that contained analysis of Converium as an indication that more information was in the market prior to the Converium IPO than is typical for a first offering. Lead Plaintiffs' expert identifies four such reports, but if the one example provided -- three pages of an HSBC report

Moreover, given that the HSBC report had limited distribution in the United States,[34] this sole report can be given little weight. In addition, the Lead Plaintiffs have not offered evidence that Converium had the ability to file an S-3,[35] that there were "market makers" for Converium stock,[36] or that the market had reacted to new information.  Thus, four of the five Cammer factors weigh against a finding of efficiency during the quiet period.

In addition, it may be noted that trading volume on both the SWX and NYSE was abnormally high during the quiet period.[37] While "high weekly stock trading volume" typically "suggests the

issued from the U.K. on November 21, 2001 -- is any guide, it appears that such reports did not contain more than cursory analysis of Converium as a stand-alone entity.

[34] The HSBC report states that "[i]t may be distributed in the United States solely to 'major US institutional investors,'" as that term is defined by U.S. securities law.

[35] As Defendants note, as a foreign issuer, the equivalent would have been a Form F-3; Converium, however, filed the more detailed Form F-1, the equivalent of an S-1 for a domestic issuer.

[36] Lead Plaintiffs note that there was significant institutional interest in Converium shares, but the term "market-maker" has a more precise definition: "one who helps establish a market for securities by reporting bid-and-asked quotations."  Black's Law Dictionary (8th ed. 2004).

[37] Lead Plaintiffs' expert notes that the average daily trading volume for ADS interests on the NYSE was 39,493 during the proposed class period; the average daily trading volume during the thirteen trading days that occurred during the quiet period was 242,662, a more than six-fold increase.  The figures cited for trading on the SWX during the quiet period are similarly inflated.

presence of active, informed investors," <u>Unger</u>, 401 F.3d at 324,

the SEC analysis noted above indicates that during the period

immediately following the IPO when trading volume is often

"abnormal," investors are likely in the process of becoming

informed and "assimilat[ing] available information," Prospectus

Delivery for Aftermarket Transactions, 1988 WL 237444, at *4-5,

and thus it is difficult to find based on the trading volume

here that the market already reflected all "available material

information regarding the company and its business" during that

time.  <u>Basic</u>, 485 U.S. at 241.

Lead Plaintiffs counter that the Converium shares and ADSs

"were traded within a relatively tight range" during the quiet

period, which they argue indicates that the market was efficient

during that time.  In support, Lead Plaintiffs' expert

calculates that "the standard deviation for Converium's relative

stock price returns (net of market and industry factors) was

only 1.37%" during the quiet period, as compared to "an average

standard deviation of 2.00% during non-event days throughout the

class period."  While this provides support for the notion that

Converium's stock was trading at an efficient price during the

post-IPO period, in light of the analysis above, it is

insufficient, standing alone, to support a conclusion that all

"available material information regarding the company and its

business," <u>Basic</u>, 485 U.S. at 241, was absorbed by the markets during that period.

Lead Plaintiffs have made a convincing showing regarding the efficiency of the Converium market during the class period more broadly -- including, notably, a strong showing of market reaction to corporate announcements, a high average weekly trading volume,[38] and close analyst coverage by a large number of firms -- and Defendants do not dispute that the Converium market should be considered to be efficient after the end of the quiet period. For the reasons stated above, however, Lead Plaintiffs have not made a sufficient showing that the Converium market should be considered to have been efficient immediately after the IPO, and thus the presumption of reliance provided by the fraud-on-the-market doctrine does not apply to the period prior to January 7, 2008.

Lead Plaintiffs' final argument -- that those who purchased prior to January 7, 2002, should nevertheless be included in the class under these circumstances because common issues would still predominate for such plaintiffs -- is also unavailing. As the Court of Appeals stated in <u>In re IPO</u>, "[w]ithout the <u>Basic</u>

---

[38] It has been recognized that an average weekly trading volume of more than 2% of outstanding shares creates a "strong presumption" of efficiency. <u>Cammer</u>, 711 F. Supp. at 1286. Lead Plaintiffs' expert states, based on a review of the trading information, that Converium interests on the NYSE had an average weekly turnover rate of 2.8%, and shares on the SWX traded at a 6% rate.

presumption, individual questions of reliance would predominate over common questions," 471 F.3d at 43. While there may be securities class actions in which this statement would not apply, Lead Plaintiffs have offered no basis for concluding that this is one of them. Indeed, the assertion that reliance is "just one issue" is singularly unpersuasive in light of Basic's recognition that it is precisely because of the unique difficulty of proving reliance individually in the modern securities market that a fraud-on-the-market doctrine is useful and necessary. 485 U.S. at 245-47.

In sum, then, the presumption of reliance provided by the fraud-on-the-market doctrine will be applied to those who purchased Converium shares and ADSs on or after January 7, 2008, and during this period "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Rule 23(b)(3), Fed. R. Civ. P. Those who purchased before that date will not be included in the certified class.

2.  Superiority

Defendants' arguments with respect to the superiority requirement of Rule 23(b)(3) focus exclusively on the potential difficulties presented by including the Foreign Plaintiffs in the proposed class. As it has already been determined that the

Foreign Plaintiffs will not be included in the class, there is

no remaining dispute on this issue, and it is clear that this

requirement is met in this case.  Factors relevant to the

superiority of a class action include:

> (A) the interest of members of the class in individually
> controlling the prosecution or defense of separate
> actions; (B) the extent and nature of any litigation
> concerning the controversy already commenced by or
> against members of the class; (C) the desirability or
> undesirability of concentrating the litigation of the
> claims in the particular forum; [and] (D) the
> difficulties likely to be encountered in the management
> of a class action.

Rule 23(b), Fed. R. Civ. P.  In this case, the proposed class --

excluding Foreign Plaintiffs -- potentially includes hundreds,

if not thousands of plaintiffs.  Litigating each case separately

would be wasteful, and result in delay and an inefficient

expenditure of judicial resources.  In addition, many investors

will be unable to seek redress of their claims except through

the class action device.  Forcing each investor to litigate

separately would also risk disparate results among those seeking

redress.  Finally, no indication has been given that competing

litigation has been filed.


III. End of the Class Period

The final substantial dispute between the parties concerns

the appropriate end date for the class period.  Lead Plaintiffs

have proposed September 2, 2004, based on an argument that the

market for Converium shares and ADSs was not "completely cured" by the disclosures made by the company prior to that date, citing In re Interpublic Securities Litigation, 02 Civ. 5627 (DLC), 2003 WL 22509414, at *5 (S.D.N.Y. Nov. 6, 2003). Defendants argue that the class period must end on November 19, 2002, citing this Court's December 2006 Opinion, which dismissed Lead Plaintiffs' Securities Act claims as time-barred due to the fact that "plaintiffs were on [inquiry] notice of Converium's alleged under-reserving practices no later than November 1[9], 2002 -- the date on which the company announced its fourth reserve increase within a year."  December 2006 Opinion, at *17.[39]

     Defendants read the December 2006 Opinion too broadly.  The discussion of the inquiry notice issue was addressed to the question of when the statute of limitations began to run for the putative class's claims under Sections 11, 12, and 15 of the Securities Act, claims that arose out of statements or omissions in the documents filed in connection with Converium's IPO. December 2006 Opinion, at *15-17.  As noted above, to state a claim under Section 11, for example, a plaintiff "only need allege that 'material facts have been omitted' from a

---

[39] The December 2006 Opinion stated that the fourth increase was announced on November 17, and not November 19, but a review of the Defendants' submissions, the complaint, and SCOR's website indicates that November 19, 2002, is the correct date.

registration statement or 'presented in such a way as to obscure or distort their significance,'" and thus a plaintiff need not allege or establish that those statements or omissions were made with scienter or even prove reliance. In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 431, 441-42 (S.D.N.Y. 2003) (quoting I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991)); see also 15 U.S.C. § 77k; Herman & MacLean, 459 U.S. at 381-82. Under 15 U.S.C. § 77m, a plaintiff is required to bring a Securities Act claim "within one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence." See December 2006 Opinion, at *15 (citation omitted). Because a Securities Act claim is tied to the statements or omissions made in the registration statement or prospectus, it follows that this statute of limitations begins to run when "an investor was on notice that the registration statement or prospectus for the offering probably contained misrepresentations actionable under the Securities Act." In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d at 450 n.23.

The complaint alleged that the Defendants violated the Securities Act because the prospectus reported, inter alia, (1) that Converium had strengthened its reserves prior to the IPO "in line with [insurance consultant] Tillinghast's . . . estimate," and (2) that these were "reasonable estimates based

56

on the information known at the time our estimates were made,"
when Converium had in fact failed to increase loss reserves
sufficiently or in keeping with the best estimates at their
disposal, which showed an additional $225 million reserve
deficiency.  Thus, the question addressed by the December 2006
Opinion was when an investor of "ordinary intelligence" would
have had actual or constructive knowledge that these assertions
in Converium's offering documents were misstatements.  December
2006 Opinion, at *15-16.  Finding that the four reserve
increases booked by Converium in 2002, which accounted for
roughly three quarters of the reserve deficiency carried as of
the IPO, were "storm warnings," the December 2006 Opinion held
that investors were put on inquiry notice of their Securities
Act claims as of November 19, 2002.  <u>Id.</u> at *17.  Plaintiffs'
argument that reassuring statements made in connection with the
2002 reserve increases were sufficient to dissipate these "storm
warnings," <u>see</u> <u>LC Capital Partners v. Frontier Ins. Group</u>, 318
F.3d 148, 155 (2d Cir. 2003), was rejected.  December 2006
Opinion, at *17.

Defendants argue that, in light of the December 2006
Opinion's conclusion that investors were on inquiry notice of
their Securities Act claims as of November 19, 2002, the
Exchange Act claims of all those who purchased after that date
must be dismissed because those purchasers cannot establish the

element of reasonable reliance.  This argument must fail.  The
December 2006 Opinion addressed the alleged misstatements in the
offering documents, and the date by which investors were on
inquiry notice as to the falsity of those statements under the
inquiry notice standard that applies to Securities Act claims.
By contrast, the Exchange Act claims arise out of not just
alleged misstatements in the offering documents, but also the
series of public announcements made by the Defendants between
December of 2001 and the Fall of 2004 regarding the company's
financial health and the status of its loss reserves.  A claim
for securities fraud under the Exchange Act arises each time a
defendant, "in connection with the purchase or sale of
securities, ma[kes] a materially false statement or omit[s] a
material fact, with scienter," provided that reliance and loss
causation are present.  <u>Lawrence</u>, 325 F.3d at 147 (citation
omitted); <u>cf.</u> <u>Ledbetter v. Goodyear Tire & Rubber Co</u>, 127 S. Ct.
1262, 2169 (2007) (stating, in the Title VII context, that "a
fresh violation takes place when each act is committed").  For
this reason, a securities fraud complaint is required to
"specify <u>each statement</u> alleged to have been misleading, [and]
the reason or reasons why the statement is misleading."  15
U.S.C. § 78u-4(b)(1) (emphasis added); <u>see also</u> <u>Rombach v.</u>
<u>Chang</u>, 355 F.3d 164, 172 (2d Cir. 2004).  It also follows that
inquiry notice of an Exchange Act claim demands notice not just

of a misstatement, but of a fraudulent misstatement, and therefore inquiry notice of such a claim will only arise "[w]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded" by a particular statement.  LC Capital, 318 F.3d at 154 (citation omitted).[40]

While Defendants are correct that, in order to bring a successful Exchange Act claim, a purchaser must establish "reasonable reliance on the alleged misrepresentations or omissions" that form the basis for his claim, Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003); see also LC Capital, 318 F.3d at 155, it logically follows from the nature of an Exchange Act claim that whether a particular class of purchasers will be able to satisfy that standard must be analyzed on a statement-by-statement basis and, indeed, will depend upon the "entire context" surrounding each allegedly fraudulent statement.  Emergent Capital, 343 F.3d at 195.  Thus, the December 2006 Opinion's conclusion regarding inquiry notice of the Securities Act claim sheds little light on whether reasonable reliance can be established for the Exchange Act claims of those who purchased after such inquiry notice arose.  And, in fact, an analysis of the "entire context," id.,

---

[40]  There is no question here that the Exchange Act claims in this action are timely; they are subject to a longer, two-year statute of limitations.  28 U.S.C. § 1658(b).

of each of the allegedly fraudulent misstatements that underlie the Exchange Act claim does <u>not</u> permit a finding that it was unreasonable as a matter of law for investors to rely on any statements made by the Defendants after November 19, 2002, regarding loss reserves.[41]

Indeed, the "reassuring statements" that the Defendants made in connection with the October and November 2002 reserve increases apparently convinced many "investor[s] of ordinary intelligence," including several of the analysts following the company, that the actions taken in 2002 had finally addressed whatever significant historical loss reserve problems the company had.  <u>LC Capital</u>, 318 F.3d at 155.  While, as the December 2006 Opinion held, those statements were not sufficient to "allay the  . . . concern" that Defendants' representations in the offering documents had been false or misleading -- indeed, the announcement of massive reserve increases only confirmed that the statements made at the time of the IPO were inaccurate -- those reserve increases and the statements made along with them appear to have been at least partially successful in reassuring the market going forward.  <u>Id.</u>  Thus, a disclosure that puts an investor on inquiry notice regarding a prior misrepresentation, may, if false, support an independent

---

[41] Defendants may, of course, revisit the issue of reasonable reliance at the time of summary judgment practice and at trial.

claim for securities fraud, and even justify reliance on future statements.

For example, the complaint cites two reports issued by Sarasin, a Swiss banking firm, indicating that its analysts were convinced that the actions taken in 2002 brought Converium's reserves "to adequate levels." In early 2003, Sarasin reported that Converium had addressed its reserve problems "in a very transparent way," and that, in its view, the company "will not have to beef up its underwriting reserves in the near future."[42] Similarly, while some analysts continued to express concern about the credibility of Converium's financial disclosures in 2003 and early 2004 -- particularly after Converium's change in its reporting scheme, discussed above -- the flood of reports issued after the July 20, 2004 announcement indicate that the 2002 actions had previously been viewed (at least by some) as sufficient to address the problems Converium had been facing and, furthermore, that the company's positive statements about its reserve issues in 2003 had largely been viewed as credible.[43]

---

[42] The event study conducted by Lead Plaintiffs' expert, Dr. Hakala, includes a quotation with a similar analysis from February 7, 2003, authored by Morgan Stanley, stating that "the bulk of adverse loss development [is] over" for Converium.

[43] For example, a Citigroup analyst stated on July 21, 2004, that "[a]fter strengthening US liability reserves in 2001 and 2002, management needed to restore its own credibility and to convince investors that its balance sheet was once again clean," and that, "[d]uring 2003, the credibility began to be restored." On the same date, Merrill Lynch reported that the July 20, 2004,

In short, it simply cannot be concluded that, as Defendants

argue, no reasonable investor could rely on any statement made

by the Defendant regarding loss reserves between November 19,

2002 and September 2, 2004, when the record presently before the

Court demonstrates that reasonable -- indeed, sophisticated --

investors and analysts did, in fact, rely on those statements

during that time.  If taken to its logical conclusion, the

Defendants' argument would require a finding that investors

could never again reasonably rely on a company's representations

as to a particular issue once they had notice that a prior

representation regarding that issue was inaccurate.  Nothing in

the December 2006 Opinion, or the Circuit opinion on which

Defendants rely, Shah v. Meeker, 435 F.3d 244 (2d Cir 2006),[44]

---

increase was a "surprise," and "particularly disappointing" in
light of the 2002 increase, which "was a seemingly large $117
million."  (The $117 million figure refers to the October 28 and
November 19, 2002, reserve increases.)

[44] Through an Exchange Act claim, the plaintiff in Shah, 435 F.3d
244, asserted that Morgan Stanley's research reports were
misleading in general because they were tainted by conflicts of
interest, and that the company's assertions of objectivity were
fraudulent.  Id. at 248.  Once those conflicts had been
described in detail in an article in Fortune magazine, the Court
of Appeals found that the plaintiff was on inquiry notice that
the company's assertions of objectivity were false and the
plaintiff could not reasonably rely thereafter "on the market
price of Morgan Stanley stock."  435 F.3d at 252.  Shah
therefore stands for the uncontroversial proposition that a
plaintiff may not reasonably rely on a later misstatement when
she was already on inquiry notice of the falsity of an earlier,
identical statement.

requires such a conclusion. The class period will therefore not be cut-off on November 19, 2002.

Defendants argue in the alternative that the class period cannot extend beyond July 20, 2004, because Lead Plaintiffs' earlier submissions in this case, as well as their complaint, indicate that the "truth" about Converium's loss reserves was "disclosed" on that date. It is appropriate to end the class period when the market was "cured," -- i.e., "when the full truth has been disclosed to the market and the natural market forces have had a reasonable period of time to receive, digest and reflect the bad news in the market price of the security." In re Oxford Health Plans, Inc., 191 F.R.D. 369, 378 (S.D.N.Y. 2000); see also Sirota v. Solitron Devices, Inc., 673 F.2d 566, 571 (2d Cir. 1982).

Based on the record submitted with this motion, it must be concluded for the purposes of class certification that the market was not "cured" by the July 20, 2004 announcement.[45] While the July 20, 2004 press release announced that Converium was increasing reserves by $400 million, it also reported that "we do not expect to see further reserve development," and that

---

[45] The prevailing view prior to In re IPO was that "certification for [a] broader class period was appropriate [where] questions of fact remained as to whether the purportedly curative press releases effected a complete cure of the market." In re WorldCom, Inc. Sec. Litig., 219 F.R.D at 207. This standard has not survived In re IPO, 471 F.3d at 35-38.

Converium was "erring on the conservative side now." Although
this announcement triggered a 50% drop in the price of Converium
shares and ADSs, it cannot be said that the "full truth" had
been disclosed. On August 30, for example, the company
announced another $100 million in reserve increases, and the
price of Converium shares fell another 11.6%. The price fell
still further on September 2 after the announcement that, as a
result of the reserve increases, Standard & Poor's and A.M. Best
were downgrading their credit ratings for Converium.

In short, the Lead Plaintiffs have shown that the market
was not "cured" on July 20, 2004, and Lead Plaintiffs' September
2, 2004 date is sufficiently supported by the current record.[46]
Thus, the class period will extend to September 2, 2004.

CONCLUSION

The Rule 23(a) and (b)(3) requirements for certification of
a class action have been satisfied. The Lead Plaintiffs' motion
to certify a class is granted in part.

SO ORDERED:

Dated:   New York, New York
         March 6, 2008

                                    _____
                                    DENISE COTE
                                    United States District Judge

---

[46] Of course, this finding does "not bind the ultimate fact-
finder," In re IPO, 471 F.3d at 38, and Defendants are free to
prove at trial that the market was cured prior to September 2.

64